Joe P. Josephson, Esq.,
Alaska Bar No. 6102018
Attorney for Plaintiff
912 W. 6th Avenue
Anchorage, Alaska  99501
Tel. (907) 276-0151
Facsimile (907) 276-0155

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOHN MITCHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| V. | ) Case No. 3:05-cv.-00264 JWS |
| | ) |
| UNITED STATES OF | ) |
| AMERICA, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**AFFIDAVIT OF JOHN MITCHELL**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) ss. |
| STATE OF ALASKA | ) |

JOHN MITCHELL, being first duly sworn upon his oath, deposes and says:

1.   I am the plaintiff in this action.

2.   I have read the portion of the United States's Motion for Summary Judgment, at pages 2-4, and will in this affidavit correct and clarify some of the statements contained therein.

3.   At page 2, the government's Motion states that (Mitchell alleges) that an electronic mail (e-mail) was sent to Ms. Sandra Martinez of the EEO Office on or about January 14, 2005, complaining of age and disability discrimination.  A copy of my e-mail to Ms. Martinez, dated January 17, 2005, is attached.

Affidavit of John Mitchell          1

(Attachment 1).

4. At page 3, the government's Motion states that I left work due to illness on January 29, 2005. I became ill because I had accepted an offer to work in Iraq, for the United States Army, but was told that I would need to be prepared to leave within a month. My illness was a reaction to a series of shots, all given to me at once, which were needed for my service to the country in Iraq.

5. On the same page, the Motion states that I returned to work on February 3, 2005 where I subsequently became ill and was temporarily hospitalized. I actually returned to work on February 2, per order. I was instructed to take an examination on that day. I said that I was too sick to take the examination, but I was required to take it anyway. Despite being ill, I scored 84%, or just 6% below requirement. Defendant Dunn used my 89% score as a pretext for terminating me. He stated I would be terminated if I did not pass the test within 72 hours, even though he knew I was too ill to work.

6. I saw Dr. Moss on February 2, later on the same day. I was running a fever of over 102 degrees the morning I took the test. Dr. Moss reported that I was temporarily disabled from work until February 5. (Attachment 2). The Government's Brief does not note that I was under physician's care by Dr. Kirk Moss, of Eagle River, Alaska. Dr. Moss gave me a physician's slip for absence from work between January 24, 2005, and January 31, 2005.

7. In a memorandum dated February 2, 2205, defendant Dunn wrote that I was absent without leave on Saturday, January 29,

Affidavit of John Mitchell                    2

2005. However, I had presented to him the physician's slip from Dr. Moss which reflected my disability on that date. Mr. Dunn replied that he did not care about what the doctor thought and he even accused Dr. Moss of having provided substandard medical care to me.

8.   Elizabeth Carryer, a registered nurse employed at Fort Richardson by the Department of the Army, wrote a memorandum about my reaction to vaccinations and confirming that she did not know if I would be ready to return to work by Saturday, January 29.   (Attachment 3).   Nurse Carryer spoke with my immediate supervisor, Mr. David Moore.   She wrote that at the end of the conversation, she understood that I was going to be off at least until Monday and then that I would return to work only if my symptoms had abated.   (Attachment 4).   When confronted with Ms. Carryer's professional opinion, however, Mr. Dunn said that he didn't care what she had to say, and that he was a G.S. 12 and she was only a G.S. 11.

9.   Dr. Moss gave me a supplemental written work status report saying that I was disabled from work between February 2 and February 5, 2005.   (Attachment 5).   On the morning of February 2, my temperature was 102.8.   (See paragraph 6 above). On that day, I told Mr. Dunn that my temporary disability would likely be extended.   He replied that he and he alone would decide if I were sick, and he commanded me to show up for work on the following day, February 3.

10. Contrary to any suggestion in the Government's Brief to the contrary, I kept my supervisor aware of the state of my

Affidavit of John Mitchell                 3

health and the status of my ability to perform work as reflected by opinions of my health care provider. There was a time, later on, discussed below, when I asked that any questions be referred to my former lawyer, Mike McDonough, or my fiancee, because I was advised to avoid stress.

11. I wish also to note that I was hired under the Veterans Readjustment Act, as a result of service-connected post-traumatic stress disorder (PTSD). My supervisors were aware of the nature of the hiring and of that condition. They also know that even when I was feeling well, I took medication for PTSD issues, including migraine headaches and related back pain.

12. I reported for work as directed on February 3. I attempted to show Mr. Moore a second note from Dr. Moss intended to allow me to be off work until February 5. Mr. Moore refused to read the note. He said that I had failed the test which I had taken on the previous day, in a sick condition, and that I had three days to pass the test. I answered that I was barely able to drive, and could not read because of my fever. He told me to wait for Mr. Dunn, who would decide if I were sick. I sat down in a chair. I tried to study test-related material. But my next memory is waking up in the Elmendorf Hospital Emergency Room. I have no idea of how I got there or what happened.

13. A few minutes after I woke up, a hospital employee brought me a telephone, because I had a call. The caller was Mr. Moore. He told me that I'd suffered a heart attack at the office. I have no memory of having talked to a doctor before that call.

Affidavit of John Mitchell                    4

14.   The Government's Motion, at page 3, states that my illness which began on February 3, 2005, and for which I was temporarily hospitalized, resulted in my 'permanent absence from work.' During the period after February 3, 2005, and until Mr. Dunn decided to terminate my employment, I was a patient at the Alaska Heart Institute at Providence Hospital, Anchorage, and of my primary health care provider, Dr. Kirk Moss. Dr. Moss kept me on a monitor for 30 days, and he confirmed in writing that I should be on medical leave for 12 weeks. (Attachment 6). So the statement that my health problems resulted in 'permanent absence from work' is only true because I was terminated while I was still under the care of physicians, one of whom having requested that I be granted leave under the Family Medical Leave program.

15.   A troubling statement in the Government's 'Factual Background' at page 3 is the statement that I was informed on March 21, 2005, that Ms. Martinez had not received any correspondence from me: I did not receive the correspondence bearing the March 21, 2005, date from Wanita Pressley.

16.   I did become aware of the e-mail message from Warrant Officer Tillmon to Colonel David Shutt, dated July 14, 2005.  I note that Warrant Officer Tillmon advises that 'there are no e-mail messages prior to 8 Feb 05 contained in (Ms. Martinez's) 'in-box' and the 'Sent Items' folder which had no history of outgoing messages from 29 Oct 04 -31 Jan. 05.'  A reasonable inference is that Ms. Martinez's e-mails, both incoming and outgoing, had been deleted.   I have also learned that Ms. Martinez's last day of employment was February 4, 2005.  Unaware

Affidavit of John Mitchell            5

of her departure, I copied her on an e-mail I sent on June 1, 2005.

17. The Notice of Proposed Removal, bearing the date of March 31, 2005, was not mailed until April 7, 2005. It was mailed from the Eagle River Post Office, not from within Fort Richardson.

18. The United States points out, at page 3 of its Brief, that the Notice says that I failed to respond to email, telephonic and certified mail requests for information about my health and plans to return to work. However, it is not pointed out that my supervisors were aware of the position of nurse Carryer and of the existence of my request for FMLA leave. Ms. Carryer wrote to me on February 25, acknowledging receipt of FMLA paper work prepared by former attorney. (Attachment 7). Thus, my supervisors were aware of my medical situation.

19. I had a call from David Moore, my immediate supervisor, on February 5, the day following my release from the intensive critical unit. I sent an e-mail saying that I was not supposed to be stressed, but that contacts could be through my attorney, Mr. Mike McDonough or my fiancee, Robin Boerner. (Attachment 9).

20. The March 31 letter stating that I could request FMLA leave was disingenuous, because my FMLA application was already submitted. It had been received by Nurse Carryer on February 25, 2005 from my lawyer, Mr. McDonough, on my behalf. Also, Dr. Moss faxed a copy to the Command Center. I believe, again, that Mr. Dunn and Mr. Moore disregarded that application because Mr. Dunn outranked Nurse Carryer.

Affidavit of John Mitchell                    6

21.  As noted above in paragraph 15, I did not receive the March 21 letter advising me to contact the EEO office.   The author of that purported letter, it should be noted, is Wanita Pressley, acting Equal Employment Manager, who was the spouse of Malcolm D. Pressley, another civil servant who reported, in a memorandum of February 15, 2005, just five weeks earlier,   his finding that my allegations of misconduct in the USARAK Command Center were not justified.

22.  My first contact with an EEO person was with Ms. Martinez on January 17, 2005, per the suggestion of General Hirai who wrote to me on January 12, 2005.   That initial contact of mine was by e-mail.  My e-mail included a complaint. (Attachment 8).

23.  On January 18, 2005, Malcolm D. Pressley started an investigation.    His wife, Wanita Pressley supervised Ms. Martinez.

24.  Soon thereafter, David Moore told me that he had been told to document negatives about me, even if he had to backdate things.

25.  I wrote to the EEOC in Seattle on April 14, after my employment was severed.  By letter sent to me on April 28, I was told I had 45 days after the personnel action or conduct that I was discriminatory to contact an EEOC counselor.  I had already contacted Ms. Martinez, an EEOC counselor.  I believed that the return of the letter, date-stamped 'RECEIVED SEDO-EEOC' signified that I had substantially complied in notifying the agency.  Since I was by then no longer a government employee, I did not have any

Affidavit of John Mitchell                    7

access to base legal services, and other on-base services. I was so informed by the EEO office when I tried to contact it, after April 9.

26.    From my contact with the EEO office, and the information given to me by that office in April before getting the correspondence from the Seattle EEOC office, I believed that EEO counselors were no longer available to me in the EEO office or personnel office where I had been employed.

27.    I brought my problems to everyone in the chain of command. I was seeking an apology for the remark that I was 'AWOL'. Among the acknowledgements I received in writing was from the Chairman of the Joint Chiefs of Staff, General Myers.

DATED at Anchorage, Alaska, this 9th day of April, 2006.

_____
John Mitchell
8

SUBSCRIBED and sworn to before me, a Notary Public in and for Alaska, this 9th day of April, 2006.

My commission expires: 1/15/2010

**John R. Mitchell**

| | |
|---|---|
| **From:** | John R. Mitchell [mitchellj@mtaonline.net] |
| **Sent:** | Monday, January 17, 2005 6:29 PM |
| **To:** | Sandra Martinez |
| **Cc:** | James T. Hirai; Paul Reoyo |
| **Subject:** | EEO Complaint |

    

Letter dtd 12 Jan    MS. Martinez.doc    100 Percent
05.doc                                 Disability Letter....

                                                    Dear Ms. Martinez,

I have attached an EEO Complaint to you.  I sincerely apologize for not sending it to you
before General Hirai advised me to do so but I never considered this an EEO Complaint.  I
can easily be reached at this e-mail address or at my home (907)-688-7610 on Mondays and
Tuesdays as I do not want to speak of this at work.  I am already catching enough heat.

Respectfully,

John R. Mitchell

*ATTACHMENT 1*

Kirk T. Moss, MD., P.C.
11432 Business Blvd. Eagle River, AK. 99577
phone (907) 694-1300 fax (907) 694-1315

Date seen: _____ 1. 24.05 _____

Patient Name: _____ JOHN   MITCHELL _____

Employer: _____

## WORK STATUS

_____ May resume REGULAR work activities immediately.

___✓___ May resume MODIFIED work activities immediately.

___✓___ Temporarily unable to resume any work activities because such activity could place him/her or co-workers at risk.

The period of disability: FROM _1. 24.05_ TO _1. 31.05_

To be determined by referral doctor: _____

May resume REGULAR activity on: _____

May resume MODIFIED activity on: _____

_____ Presently unable to determined work date.

## WORK LIMITATIONS

_____ Lifting, pushing, pulling not to exceed _____ pounds.

_____ Bending or twisting not to exceed _____ times per hour.

_____ Sitting job only. _____ No climbing or overhead work.

_____ No operation of moving equipment.

_____ Right hand work only. _____ Left hand work only.

_____ Keep wound clean and dry:

Other: _____

## FOLLOW-UP CARE/REFERRAL

_____ Discharge from medical care.

_____ Return to see Dr. Moss on: _____

_____ Referred for follow-up care to: _____

_____ Appointment scheduled for: _____

Additional comments: _Local   reaction   as   well   as   fever   and   flu_

~~PHYSICIAN~~           _1. 29.05_           _type   sx   is_
                         DATE                _common   after   the_
                                             _shots   he   had;_
                                             _advised   to   rest   and_
                                             _stay   in   bed._

_ATTACHMENT 2_



**DEPARTMENT OF THE ARMY**
Fort Richardson Detachment
US Army Medical Detachment Activity
Preventive Medicine Department
600 Richardson Drive #7450
Fort Richardson, AK 99505-7450

MCUC-PM-OH-R

02 February 2005

MEMORANDUM FOR RECORD

SUBJECT: Phone Conversation Conference Call 27 Jan 2005

I was called at my office on 27 Jan 2005 about 1400 by Mr. David Moore, he was asking for an opinion about a patient being contagious after receiving multiple vaccinations. I inquired about the number and the type of vaccinations given and what problems the patient was experiencing. Mr. Moore connected us with a conference call to the patient, Mr. John Mitchell. After explaining that there was no way the patient was contagious, I went on to explain that he would probably suffer some adverse effects for having gotten so many vaccinations at the same time. I added that the fever the patient was currently suffering could last for several days and that he might not feel too good during that time. Mr. Moore remarked that he would just put Mr. Mitchell off duty until, Monday. Mr. Mitchell replied that he thought he would probably be in on Saturday. Then, I added that I didn't know if he would be ready by then. At the end of the conversation, I understood that Mr. Mitchell was going to be off at least until Monday and then return to work only if his symptoms had abated.

*Elizabeth Carryer*
Elizabeth Carryer, R.N. COHN-S
Occupational Health Nurse
Fort Richardson, AK 99505

ATTACHMENT 3
&
ATTACHMENT 4

**Kirk T. Moss, MD., P.C.**
11432 Business Blvd. Eagle River, AK. 99577
phone (907) 694-1300 fax (907) 694-1315

Date seen: _____ 2.2.05 _____

Patient Name: _____ JOHN    MITCHELL _____

Employer: _____

## WORK STATUS

_____    May resume REGULAR work activities immediately.

_____    May resume MODIFIED work activities immediately.

_____    Temporarily unable to resume any work activities because such activity could place him/her or co-workers at risk.

The period of disability:    FROM _2.2.05_ TO _2.5.05_

To be determined by referral doctor: _____

May resume REGULAR activity on: _____

May resume MODIFIED activity on: _____

_____    Presently unable to determined work date.

## WORK LIMITATIONS

_____    Lifting, pushing, pulling not to exceed _____ pounds.

_____    Bending or twisting not to exceed _____ times per hour.

_____    Sitting job only.    _____ No climbing or overhead work.

_____    No operation of moving equipment.

_____    Right hand work only.    _____ Left hand work only.

_____    Keep wound clean and dry:

Other: _____

## FOLLOW-UP CARE/REFERRAL

_____    Discharge from medical care.

_____    Return to see Dr. Moss on: _____

_____    Referred for follow-up care to: _____

_____    Appointment scheduled for: _____

Additional comments: _____

PHYSICIAN _____    2.2.05
                     DATE

**Certification of Health Care Provider**
(Family and Medical Leave Act of 1993)

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division



---

*(When completed, this form goes to the employee, Not to the Department of Labor.)*

| | |
|---|---|
| OMB No.: | 1215-0181 |
| Expires: | 07/31/07 |

| 1. Employee's Name | 2. Patient's Name *(If different from employee)* |
|---|---|
| MITCHELL, JOHN | N/A |

3. Page 4 describes what is meant by a "**serious health condition**" under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, please check the applicable category.

(1) _____ (2) _____ (3) _____ (4) _×_ (5) _____ (6) _____, or None of the above _____

4. Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

ACUTE STRESS REACTION, SEVERE ENOUGH TO CAUSE CARDIAC DYSRHYTHMIA, AND MAY LAST 3 MONTHS.

5. a. State the approximate date the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present incapacity[2] if different):

A.) MR. MITCHELL WAS FIRST SEEN AT THIS OFFICE 22 DEC 04.

B.) DURATION OF INCAPACITY IS 12 WEEKS, UNLESS SHORTENED OR LENGTHENED BY REFERRAL TO A PSYCHIATRIST.

   b. Will it be necessary for the employee to take work only **intermittently or to work on a less than full schedule** as a result of the condition (including for treatment described in Item 6 below)?

NO WORK FOR 12 WEEKS, STARTING NOW.

If yes, give the probable duration:    SEE ABOVE.

   c. If the condition is a **chronic condition** (condition #4) or pregnancy, state whether the patient is presently incapacitated[2] and the likely duration and frequency of episodes of incapacity[2]:

SEE "4,5 ABOVE.

---

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

Form WH-380
Revised December 1999

ATTACHMENT 6

6. a. If additional treatments will be required for the condition, provide an estimate of the probable number of such treatments.

*APPROXIMATELY 6 TREATMENTS @ MY OFFICE, PLUS AN UNKNOWN NUMBER OF PSYCHIATRIC VISITS.*

If the patient will be absent from work or other daily activities because of **treatment on an intermittent or part-time** basis, also provide an estimate of the probable number of and interval between such treatments, actual or estimated dates of treatment if known, and period required for recovery if any:

*N/A*

b. If any of these treatments will be provided by **another provider of health services** (e.g., physical therapist), please state the nature of the treatments:

*PATIENT IS BEING REFERRED TO A PSYCHIATRIST (DR. AARON WOLFE), WITH INITIAL APPOINTMENT FOR 8 MAR 05.*

c. If **a regimen of continuing treatment** by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment):

*PATIENT WILL COME TO MY OFFICE ON AN "AS NEEDED" BASIS*

7. a. If medical leave is required for the employee's absence from work because of the employee's own condition (including absences due to pregnancy or a chronic condition), is the employee **unable to perform work of any kind?**

*YES*

b. If able to perform some work, is the employee **unable to perform any one or more of the essential functions of the employee's job** (the employee or the employer should supply you with information about the essential job functions)? If yes, please list the essential functions the employee is unable to perform:

*N/A*

c. If neither a. nor b. applies, is it necessary for the employee to be **absent from work for treatment?**

*N/A*

*ATTACHMENT 6*

8.  a.  If leave is required to care for a family member of the employee with a serious health condition, **does the patient require assistance for basic medical or personal needs or safety, or for transportation?**

N/A

b.  If no, would the employee's presence to provide **psychological comfort** be beneficial to the patient or assist in the patient's recovery?

N/A

c.  If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need:

N/A

| | |
|---|---|
| _K____ MD_ | _FAMILY PRACTICE_ |
| Signature of Health Care Provider | Type of Practice |
| _11437 BUSINESS BLVD_ | _901·694·1300_ |
| Address | Telephone Number |
| _EAGLE RIVER, AK 99577_ | _14 FEB 05_ |
| | Date |

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

| | |
|---|---|
| _____ | _____ |
| Employee Signature | Date |

ATTACHMENT 6

A **"Serious Health Condition"** means an illness, injury impairment, or physical or mental condition that involves one of the following:

1. Hospital Care

   **Inpatient care** (*i.e.*, an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity[2] or subsequent treatment in connection with or consequent to such inpatient care.

2. Absence Plus Treatment

   (a) A period of incapacity[2] of **more than three consecutive calendar days** (including any subsequent treatment or period of incapacity[2] relating to the same condition), that also involves:

      (1) **Treatment**[3] **two or more times** by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; or

      (2) **Treatment** by a health care provider on **at least one occasion** which results in a regimen of **continuing treatment**[4] under the supervision of the health care provider.

3. Pregnancy

   Any period of incapacity due to **pregnancy**, or for prenatal care.

4. Chronic Conditions Requiring Treatments

   A **chronic condition** which:

      (1) Requires **periodic visits** for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

      (2) Continues over an **extended period of time** (including recurring episodes of a single underlying condition); and

      (3) May cause **episodic** rather than a continuing period of incapacity[2] (*e.g.*, asthma, diabetes, epilepsy, etc.).

5. Permanent/Long-term Conditions Requiring Supervision

   A period of incapacity[2] which is **permanent or long-term** due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

6. Multiple Treatments (Non-Chronic Conditions)

   Any period of absence to receive **multiple treatments** (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for **restorative surgery** after an accident or other injury, **or for a condition that would likely result in a period of incapacity**[2] **of more than three consecutive calendar days in the absence of medical intervention or treatment**, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), and kidney disease (dialysis).

This optional form may be used by employees to satisfy a mandatory requirement to furnish a medical certification (when requested) from a health care provider, including second or third opinions and recertification (29 CFR 825.306).

*Note:* Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.

---

[3] Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations.

[4] A regimen of continuing treatment includes, for example, a course of prescription medication (*e.g.*, an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition. A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

**Public Burden Statement**

We estimate that it will take an average of 20 minutes to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

*DO NOT SEND THE COMPLETED FORM TO THIS OFFICE; IT GOES TO THE EMPLOYEE.*

Your message

To:      Carryer Elizabeth M FRA PMS OCC HLTH
Cc:      Michael McDonough
Subject: FMLA Paperwork for John R. Mitchell
Sent:    Fri, 25 Feb 2005 09:59:06 -0900

was read on Mon, 28 Feb 2005 07:07:17 -0900

ATTACHMENT 7
(CONT.)

John R. Mitchell

---

**From:**       Carryer Elizabeth M FRA PMS OCC HLTH [elizabeth.carryer@us.army.mil]
**Sent:**       Monday, February 28, 2005 7:50 AM
**To:**         John R. Mitchell
**Subject:**    RE: FMLA Paperwork for John R. Mitchell

Mr. Mitchell,
I finally got a copy of the FMLA papers from your lawyer's office Friday
afternoon, about the same time your email arrived.  I need to find out
if these have already been forwarded to your supervisor or not?  Thanks

Liz Carryer, R.N.   COHN-S
Occupational Health Nurse
Fort Richardson, AK

-----Original Message-----
From: John R. Mitchell [mailto:mitchelj@mtaonline.net]
Sent: Friday, February 25, 2005 9:59 AM
To: Carryer Elizabeth M FRA PMS OCC HLTH
Cc: Michael McDonough
Subject: FMLA Paperwork for John R. Mitchell
Importance: High

Dear Ms. Carryer,

Here is the paperwork we discussed earlier today pertaining to the
Family
and Medical Leave Act.  Thank you very much for all the assistance you
have
given me.

Sincerely Yours,

John R. Mitchell

1

ATTACHMENT 7

P.O. Box 771765
Eagle River, Alaska 99577

January 14, 2005

RE: Letter for Brigadier General Hirai

Ms. Sandra Martinez
Equal Employment Opportunity Manager
724 Postal Service Loop
Fort Richardson, Alaska 99505

Dear Ms. Martinez,

I am writing this letter to you at the request of Brigadier General Hirai. General Harai asked me to contact you because, I wrote a letter, to my supervisor Mr. Dennis J. Dunn, the Operations Manager of the USARAK Command Center.

In my letter I made references to my belief that Mr. Dunn is guilty of discrimination based upon my age and disability. I am 49 years of age and I have a 100% Disability based upon a Veterans Administration Disability Rating. I have a copy of my disability letter as attached as enclosure 1.

Mr. Dunn did hire me under the Veterans Readjustment Act but shortly after beginning to work at the command center Mr. Dunn began to make little comments directed at me about both my age and my disability.

Comments made to me are first once when we were moving some boxes with telephones in them I was assisting two of my coworkers by bring the boxes one at a time to where they where opening them up and verifying the serial numbers insuring all the accessories were in the box. When Mr. Dunn saw me do this he told me to set at the console and stay there because that was a job for "the sick, lame, and lazy." I did as I was told but I did not make a fuss about it. Later I had a coworker tell me that on several occasions Mr. Dunn has made comments like I exaggerated the extent of my injuries and even asked my coworker to start documenting how medication was affecting me shortly after returning to work after major surgery. My coworker also told me he believed that Mr. Dunn was sorry he hired me and thought that he was going to use how the pain killers I was forced to take as grounds to dismiss me from the job. Currently I am not taking any pain killers but other medication as I will describe below even though the chairs in the command center cause me a great deal of pain I will not make a complaint based upon personal convenience.

Mr. Dunn has also made several references pertaining to my age. These remarks pretty much the same to both my coworker and me. That it is pretty humiliating that at my age and with my education that I would be accept a GS-5 job. He also told my coworker that my last job was on the verge of firing me before I transferred to FT. Richardson.

ATTACHMENT 8

Because, of the way Mr. Dunn runs the command center through fear I will tell you my coworkers name off the record and ask you to interview him in that way. This man needs this job and is very fearful of Mr. Dunn as using the threat of firing is his style of management. I am sure he will talk to you but it must be done in a discrete manner as he is very fearful of his job.

When I was hired at the USARAK Command Center I was hired as a GS-5 but was told that the position was going to be upgraded to a GS-5, GS-7, GS-9 progression. To date nothing has been done but I did not make any complaints. However, during the November training meeting Mr. Dunn announced that the next GS-9 positions coming open would be going to Mr. Tom Anderson and the next GS-9 coming open would be going to Ms. Donna Sailor. Both Mr. Anderson and Ms. Sailor have been hired after I began working at the command center. He also announced that he was going to try and create either a 2100 or 2200 series Information Technology job in the command center. This job would be going to Mr. Kurt Doan a temporary hire. All three of these people worked for Mr. Dunn when they were in the Army. Mr. Doan had at one time told both myself and Mr. Moore that Mr. Dunn had promised him a GS-9 but he got caught on stop loss while in Korean and could not retire in time to take one of the jobs.

After the meeting I asked Mr. Dunn if I could be considered for the IT position coming open as I have a B.S. in Electronics Technology I was told no the job was going to Kurt. My immediate supervisor Mr. David A. Moore also asked Mr. Dunn if I could be considered for the job as I had the necessary qualifications but Mr. Dunn told Mr. Moore that in his opinion I was not qualified and would not even be considered.

After that I have been having a lot of back pain from tension and migraine headaches. A couple of weeks ago I wrote Mr. Dunn a list of my grievances and have cc'd a copy to the entire chain of command as well as our complete congressional delegation. I apologize that I did not think of sending you a copy as well but am willing to provide all the documentation to you if you would like.

Since filing my Congressional I have been really taking heat and have even been threatened with termination. But that is a problem the command needs to deal with and it is in their hands.

Respectfully,

John R. Mitchell
(907)-688-7610 (Home)
mitchelj@mtaonline.net

Enclosure (2):  VA Disability Letter
                Letter from BG Hirai

**John R. Mitchell**

**From:**         John R. Mitchell [mitchelj@mtaonline.net]
**Sent:**         Saturday, February 05, 2005 11:57 PM
**To:**         David A. Moore
**Subject:**     Medical Notes


Doctors Stay Home
Note.doc


ICU Stay Home
Note.doc

Dave,

I have been ordered by my doctor to stay out of work and get rest until they have been able to determine the cause of my recent medical problem.  I am not to return to work as per the enclosed notes until the doctor deems it advisable.  I will not be taking any phone calls or visits except from family, medical personnel, and my legal advisor.  This is because I am not to be stressed in any way.

Upon legal advice Robin will not be entering FT Richardson or telephoning anyone at the Command Center.  I will keep you abreast of what is going on via e-mail or my attorney.

Due to the multiple medications that I am taking I am unable to operate a vehicle and since Robin  will not enter the post my truck will be in the parking lot until I am able to drive safely.  I have been informed that had this incident occurred while driving I could have placed both myself and other at risk.

Here is two notes one from Dr. Moffett from the Elmendorf ICU telling me not to return to work until 9 Feb 2005.  The other note is from my primary care physician who is now responsible for my medical care.  There are no dates on this letter because he is requesting more medical test that he is not sure when they will be completed and he does not want me to be under any stress until all the medical test and consultations are completed.

I will let you know as soon as there is a change in my status.

I am cc'ing a copy of these medical notes to the FT Richardson Occupational Nurse and she will be kept in the loop.  If she has any questions she is welcomed to call my home and speak to Robin.

A note to the Occupational Nurse.  Please feel free to give Robin a call at my home 688-7610.  I wish to keep you informed of my status so I can have a health care professional explain to my status to Operations Manager of the Command Center as he is incapable of understanding the last doctors note on his own.  Also, please inform Mr. Dunn that I am covered by HEPA.

Attachment 9