Joe P. Josephson, Esq.
Josephson & Associates, P. C.
912 West Sixth Avenue
Anchorage, Alaska 99501
Tel. (907) 276-0151
Facsimile (907) 276-0155
Email: jjosephson@aol.com

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOHN MITCHELL,<br><br>　　　　Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>et al.,<br><br>　　　　Defendants. | Case No. 3:05-cv-00264-JWS<br><br><br><br>**PLAINTIFF'S OPPOSITION TO THE**<br>**DEFENDANTS' MOTION TO DISMISS,**<br>**OR IN THE ALTERNATIVE, FOR**<br>**SUMMARY JUDGMENT.** |

**Part One.   Introduction & Facts**.

On January 14, 2005, Plaintiff, John Mitchell, wrote to Sandra Martinez, Equal Employment Opportunity Manager at Fort Richardson, Alaska.[1] But not only that: Mitchell sent copies of his e-mail to Ms. Martinez to the Commander of the United States Army, Alaska ["USARAL"], (Brigadier General James T. Hirae), and to the Chief of Staff at USARAL, Colonel Paul Reoyo.[2]

---

[1] Plaintiff's Exhibit 1 [Mitchell's e-mail to Ms. Martinez]; affidavit of John Mitchell, page 1, paragraph 1. (Unless otherwise indicated, references to the "affidavit of John Mitchell" or to the "affidavit of Mitchell" refer to his affidavit of December 19, 2006, attached to this Brief). In addition, Mitchell communicated with Ms. Martinez by letter. Plaintiff's Exhibit 2.
[2] See Plaintiff's Exhibit 1.

Also in January, 2005, Mitchell prepared a 17-page document, his "TALKING POINTS. . .".[3] Like his communications to Sandra Martinez, "TALKING POINTS" was distributed widely.[4] Nine people in his chain of command got copies of "TALKING POINTS" by certified mail, and it is noteworthy that the first paragraph of page one is headed "Age Discrimination".[5]

Even viewed neutrally -- and thus, *a fortiori*, with the favorable inferences to which Mitchell is entitled as the non-moving party[6] -- the facts suggest that the Army's treatment of Mitchell was unreasonable and retaliatory, and that but for Mitchell's age and complaint to the Equal Employment Opportunity manager and circulation of his "TALKING POINTS" memorandum, he would have been treated with a modicum of decency by his supervisors after he fell ill on January 29, 2005 -- and he would still be an employee of the United States.

The United States, in the barest conceivable terms, states that Mitchell "left work due to illness on January 29, 2005."[7] The United States does not mention that Mitchell's illness was secondary to numerous shots he received as a volunteer for

---

[3] Plaintiff's Exhibit 3.
[4] Plaintiff's Exhibit 4.
[5] *Id.*
[6] Fed. R. Civ.P. 56; *T.W.Elec.Service, Inc. v. Pacifi Elec.Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).
[7] Motion to Dismiss, or in the Alternative for Summary Judgment at 4.

civilian work, as an employee of the Army in Iraq.[8]

The immediate cause of Mitchell's illness was a series of nine shots administered to him on January 24, 2005, in connection with his anticipated imminent deployment as a civilian employee in Baghdad.[9] Occupational Health Nurse Elizabeth Carryer attested to the adverse effects on Mitchell of those shots.[10]

Also attesting to those effects was Dr. Kenneth Moss, who, in writing, explained that plaintiff was temporarily disabled due to the shots, was suffering from a fever and from flu symptoms, and that Mitchell would be unable to work on January 29, 2005.[11] Mitchell himself recalls that his temperature on January 29, 2005 was 102.8.[12]

On January 27, 2005, Mitchell and his immediate supervisor had a conference call with nurse Carryer. She told Moore that she expected Mitchell's fever to "last for several days. . .".

Before January 29, 2005, Mitchell called his immediate supervisor, David Moore. He reported that he was ill because of the shots, and that he had a note from his doctor which he would

---

[8] Affidavit of John Mitchell, page 2, paragraph 5.
[9] *Id.*
[10] Plaintiff's Exhibit 5.
[11] Exhibit 7.
[12] Affidavit of John Mitchell, page 3, paragraph 9.

bring to the office when he returned to work.[13]

Mitchell was summoned to work on February 2, 2005, although it was not his normal workday.[14] Mitchell was still very ill. He was directed to take a test, which he failed "by one question". This was the only test he had failed.[15]

Despite Mitchell's continuing fever, Moore demanded that he return to work again on February 3. Mitchell reported as instructed. He soon passed out. Moore saw Mitchell on the floor going into what Moore believed were "convulsions", and Mitchell was rushed to Elmendorf Air Force Base Hospital.[16]

Mitchell was discharged from Elmendorf Air Force Base Hospital and admitted to Alaska Heart Institute, at Providence Hospital, in Anchorage.[17] Although he was an inpatient, in critical care, his supervisors (Messrs. Dunn and Moore) were calling him. While Mitchell was hooked up to a heart monitor, Mr. Dunn told him that he was "faking it."[18]

In another episode, Mr. Malcolm Pressley, civilian USARAL's Director of Plans and Operations, came to Mitchell's bedside, ostensibly to present a "get well" card from colleagues at

---

[13] *Id.*, page 2, paragraph 5 and page 4, paragraph 10.
[14] *Id.*, page 4, paragraph 11.
[15] *Id.*
[16] Plaintiff's Exhibit 8.
[17] See affidavit of John Mitchell, page 5, paragraph 14.
[18] *Id.*

work.[19]  Mr. Pressley had gained entry into plaintiff's hospital room through a ruse: he told the nurse and Mitchell's fiancee that he had to talk to the patient about a "classified matter." Once they were alone, Mr. Pressley told Mitchell that the chain of command knew that he had "faked" the heart episode and that he had "better get his act together."[20]

Mr. Pressley's wife, Wanita Pressley, who was employed as Acting Equal Employment Manager at Fort Richardson, wrote to Mitchell on March 21, 2005, saying that Fort Richardson EEO Manager Martinez had not gotten "an informal EEO complaint", "electronically", from Mitchell.[21]

Of course, Exhibits 1 and 2 belie Mrs. Pressley's proposition[22], which is also contradicted directly by Mitchell himself.[23]  The extent of the Army's effort to stymie Mitchell in this regard is made manifest by the findings of Warrant Officer Clifton Tillman, who discovered, when attempting on July 14, 2005, to review Ms. Martinez's e-mail account, that there were

> . . .no e-mail messages prior to 8 Feb 05 contained in {Ms. Martinez's) 'Inbox' and the 'Sent Items' folder which had no history of outgoing messages from 29 Oct 04 - 31 (to) Jan 05.[24]

---

[19] A copy of the card is attached as Exhibit 9. See affidavit of John Mitchell, page 5, paragraph
[20] Affidavit of John Mitchell, page 5, paragraph 15.
[21] Exhibit 10.
[22] Mitchell learned that Wanita Pressley is the wife of Malcolm Pressley only as a result of a Freedom of Information Act request. Affidavit of John Mitchell, page 6, paragraph 19.
[23] *Id.*, page 5, paragraph 16.
[24] Exhibit 12.

Thus, Mrs. Pressley was trying to prove a proposition that was clearly untrue and which may have been based upon an e-mail account which had already been sanitized of all messages from the relevant period, both incoming and outgoing.

Mitchell's supervisors (Messrs. Moore and Dunn) ruthlessly characterized him as "AWOL", a defamatory characterization made in bad faith.[25] In fact, Mitchell was under doctors' instructions to avoid contact with the supervisors.[26] Mr. McDonough gave FMLA documentation to occupational nurse Elizabeth Carryer at Fort Richardson.[27] She attempted to give that documentation to the supervisors.[28] In addition, Dr. Kirk Moss faxed the FMLA documents to Mr. Dunn.[29]

It was against this background that Mitchell submitted a letter of resignation on April 5, 2005, perceiving that his superiors were creating a hostile and discriminatory atmosphere towards him.[30]

---

[25] For Mitchell, a disabled veteran who served the nation for many years, the use by his supervisors of the term, "AWOL", was deliberately calculated to harm him emotionally and financially. Affidavit of John Mitchell, page 8, paragraph 27. The superiors knew he was disabled, and suffered from post-traumatic stress disorder (PTSD). During most of the period he was absent, *i.e.*, until late March, he believed that his absence was excused under the FMLA. *Id.* There is no evidence that either Mr. Dunn or Mr. Moore, or anyone else in the chain of command, put plaintiff on notice that FMLA status had been declined.
[26] Affidavit of John Mitchell, pages 7-8, paragraph 23.
[27] *Id.*, page 8, paragraph 24; exhibit 13.
[28] *Id.*, page 8, paragraph 24.
[29] *Id.*, page 8, paragraph 26.
[30] *Id.*, pages 8-9, paragraphs 28 and 29.

But the government's efforts to punish and retaliate against Mitchell were not over. Rather than accept his letter of resignation, effective May 1, 2005, which his superiors received on April 7, 2005, management considered that he was "removed" before May 1, thus denying Mitchell a federal disability stipend (with which he would have paid for health insurance), and preventing is participation in the federal Blue Cross/Blue Shield program. These issues, as well as Mitchell's lack of resources to participate in COBRA, were all discussed by Mitchell with Mr. Dunn.[31]

**Part Two.  Questions Presented.**

1. Should Mitchell's case be dismissed for failure to exhaust "administrative remedies"?[32]

2. Should Mitchell's case be dismissed because the Secretary of the Army is not a named defendant?[33]

3. Should Mitchell's case be dismissed because there was no "adverse action" taken against him by the Army?[34]

4. Should Mitchell's case be dismissed, or summary judgment be granted, because of Mitchell's "complete failure to return to work after February 9, 2005", and thus failed to perform "to

---

[31] Affidavit of John Mitchell, page 9, paragraphs 29-30.
[32] See the United States's Motion at pp. 8-10.
[33] *Id.* at p. 2, n. 1.
[34] *Id.* at pp. 10-12.

legitimate expectations".[35]

For the reasons set forth below, all of these questions should be answered in the negative.

**Part III.  ARGUMENT**

### A. The Government Cites One Case for the Proposition that Mitchell's Case Should Be Dismissed for Failure to Exhaust Administrative Remedies, and the Government Motion Misunderstands That Case.

In contending that Mitchell's case should be dismissed for failure to exhaust administrative remedies, the government cites a single case, *Bankston v. White* (9th Cir. 2003).  There, as here, the government argued that the court's jurisdiction to consider the plaintiff's ADEA complaint was barred by the plaintiff's failure to pursue administrative action before filing suit.

Rejecting the government's argument, and reversing the district court's dismissal of Bankston's Age Discrimination in Employment Act claim for lack of jurisdiction, the Bankston panel cited the Ninth Circuit's decision in *Bak v. Postal Service*, 52 F.3d 241 (9th Cir. 1995).

In *Bak*, the Court of Appeals cited four reasons for holding that Bak's ADEA claim was not barred by failure to pursue the plaintiff's age claim administratively, including the fact that administrative and judicial proceedings would not be proceeding

---

[35]  *Id.* at pp. 13-17.

simultaneously and "the fact that a contrary holding would result in a forfeiture of Bak's claim." *Id.* at 243.

In *Bak*, the Court of Appeals flatly declared:

> **(W)e hold that a claimant is no longer required to exhaust his administrative remedies with regard to an age discrimination claim prior to filing a civil suit.** The result of [29 C.F.R. sec. 1613.513, in effect at the time Bak filed his complaint, is to terminate any unexhausted administrative proceedings when a claimant files a civil suit. Similarly, an exhaustion requirement would terminate any civil suit filed. Thus, the joint effect of the amended regulations and exhaustion requirement would be to leave the claimant without any avenue of relief.[36]

Far from supporting the government's motion to dismiss, *Bankston v. White* (as well as *Bak v. Postal Service*, followed in *Bankston*) undermine that motion. Hence, the question whether Mitchell's ADEA claim should be dismissed for failure to exhaust administrative remedies should be answered in the negative as a matter of law.

Furthermore, the government's motion relies upon the idea that Mitchell never contacted Sandra Martinez, the Fort Richardson EEO manager, to complain about age discrimination. But Plaintiff's exhibits 1, 2 and 13, and plaintiff's affidavit at pages 6-7, paragraph 18, prove that a critical premise of the government's argument is simply wrong.

---

[36] **Emphasis** added; 52 F.3d at 244.

Plaintiff's Opposition to the Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment
Case No. 3:05-cv-00264-JWS
Page 9 of 19