**B.   Mitchell's Case Should Not Be Dismissed Because the Secretary of the Army is Not a Named Defendant.**

In footnote 1 at page 2, the government cites *Romain v. Shear*, 799 F.2d 1416, 1418 (9th Cir. 1986) for the proposition that "(t)he only proper defendant under the ADEA is the Secretary of the Army, Francis J. Harvey, and then, only in his official capacity." In the same footnote, the government says that Mitchell's ADEA claims "should be dismissed for lack of subject matter jurisdiction" because the complaint does not mention Secretary Harvey.

In *Romain*, the plaintiff sought to amend his complaint to include the Secretary of Transportation, whom he had not named as a defendant. Romain, who had been employed by the Department of Transportation's Maritime Administration, lost his job through a reduction-in-force.  Romain appealed to the Merit System Protection Board (MSPB), which affirmed the agency action.  In his suit, filed within 30 days after the MSPB decision, Romain claimed age discrimination in violation of ADEA, and made other claims too.

Noting that Romain had not named the Secretary of Transportation and <u>also did not notify any other government official or entity</u>, and that Congress had enacted a specific

Statute of limitations[37] governing the review of MSPB decisions, the Court of Appeals concluded that "Romain's failure to name the proper defendant thus could not be remedied by a Rule 15 amendment." 7999 F.2d at 1419.

5 U.S.C. sec. 7703 does not apply to Mitchell's case. Section 7(c) of the ADEA[38] incorporates section 6(a) of the Portal to Portal Act[39], which provides for a two-year statute of limitations for bringing suit, except for willful violations, to which a three-year limitation applied. Since all the acts complained of took place in 2005, it is clear that a motion to amend the complaint so as to identify the Secretary of the army would be timely. Such an amendment, incidentally, would relate back to the date of the original complaint, since the Secretary, sued in his official capacity, will not be prejudiced in maintaining his defense on the merits, and since the Secretary knew, or should have known, that the action would have been brought against him but for the oversight. See Fed.R.Civ.P. 15(c).

## C. There Was "Adverse Action".

Mitchell resigned his employment. For the defendant, that appears to resolve the matter, because Mitchell was not formally

---

[37] 5 U.S.C. 7703.

[38] 29 U.S.C. 255(a).

[39] 29 U.S.C. 251-262

terminated.

But the government overlooks the doctrine of constructive discharge, which is applicable to claims of age discrimination.

One of the two scenarios in which the doctrine of constructive discharge arises is where the employer imposes intolerable working conditions.[40]    Mitchell's affidavit presents evidence that by creating and imposing intolerable working conditions, his supervisors intentionally forced his resignation.[41]

Courts, which consider whether the doctrine of constructive discharge is applicable generally, apply a reasonable person test in determining whether the alleged intolerable conditions would compel the employee to resign.[42]

In *Satterwhite v. Smith, supra,* the Ninth Circuit stated that in determining whether the plaintiff had been constructively discharged because of his race, "we must find that a reasonable person in his position would have felt that he was forced to quit because of intolerable and discriminating working conditions", citing *Nolan v. Cleland*, 686 F.2d 806, 813-14 (9th Cir. 1982) and *Heagney v. University of Washington*, 642

---

[40] See, *e.g., Cazzola v. Codman & Schurleff, Inc.*, 751 F.2d 53, 55 (1st Cir. 1984); see *Pena v. Brattleboro Retreat*, 702 F.2d 322 (2d Cir. 1983).

[41] Affidavit of John Mitchell, *e.g.*, pages 2-5, paragraph 12.

[42] *Watson v. Nationwide Insurance Co.*, 823 F.2d 360 (9th Cir. 1987); *Satterwhite v. Smith*, 744 F.2d 1380 (9th Cir. 1984); *Nolan v. Cleland*, 686 F.2d 806 (9th Cir. 1982).

F.2d 1157, 1166 (9th Cir. 1981).

In *Nolan v. Cleland, supra*, the plaintiff quit her job with the Veterans Administration, after the agency rejected her for a special graduate education program, provided an inaccurate evaluation, and assigned her to an out of town position she had not requested, even though the agency ordinarily only assigned applicants to that position if they had asked for it. The Ninth Circuit reversed a summary judgment against the plaintiff, remanding the case for trial on whether the conditions described would have forced a reasonable person in her position to quit. The court held that a showing of four incidents of differential treatment over a period of two years was sufficient to create a genuine issue of fact for trial. 686 F.2d at 813-14.

The government's argument that there was no adverse action is just a fragile house of cards. For the argument to have any weight, its advocates must seek to confine attention to only the Notice of the Proposed Removal and the threat to "start documenting", with "backdating events", as the only adverse actions taken against Mitchell, and contend that Mitchell "is complaining of an event that never came to fruition."[43]

But once the whole story of the abuse heaped on Mitchell, culminating in constructive discharge, begins to emerge, and is

---

[43] Motion at 12.

posited (as it must be for the purposes of the pending motion) the government's argument that there was no "adverse action" simply collapses.

### D. The United States Has Not Demonstrated, for the Purposes of Its Motion to Dismiss, or, Alternatively, To Obtain Summary Judgment, That Mitchell Failed to Perform Legitimate Expectations.

After his supervisors subjected Mitchell to unreasonable stress, jeopardized his health, defamed his loyalty by referring to him as "AWOL", ridiculed both his service to the country and his age, told Mitchell while he was in intensive care that he was "faking" his heart ailment, willfully ignored FMLA documents faxed by Dr. Moss and presented by nurse Carryer, and allowed Mitchell, while he recuperated, to reasonably consider that his absences were excused under FMLA, the United States is seen here to argue that, as a matter of law, Mitchell, by reason of his absences, failed to perform to legitimate expectations. Defendant's motion at 13-14.

For its argument, the United States cites two cases, one from the Ninth Circuit and one from the Tenth Circuit.

Why the United States believes that *Humphrey v. Memorial Hospitals Association*, 239 F.3d 1128 (9th cir. 2001), is helpful to its cause is unclear. In that case, the Ninth Circuit reversed the district court's award of summary judgment, given to the employer-defendant ("MHA") in a case brought under the

Americans with Disabilities Act ("ADA").

Humphrey, a medical transcriptionist, was chronically late because she daily engaged in a series of obsessive morning grooming rituals which hindered her ability to arrive at work on time.

The employer gave her a series of progressive warnings, as well as "tips" about how to change her rituals. Psychiatric and psychological counseling were provided, and the psychiatrist diagnosed plaintiff with obsessive compulsive disorder ("OCD"), identifying that disorder as the reason for her chronic tardiness.

Despite repeated warnings from her supervisor over a summer season, and an offer to grant her a leave of absence (which Humphrey rejected), Humphrey continued to miss work.

Even so, the district court's award of summary judgment was reversed by the Court of Appeals. It held that Humphrey had

> presented sufficient evidence to create a
> triable issued of fact as to whether her
> attendance problems were caused by OCD.
> In sum, a jury could reasonably find the
> requisite causal link between a disability of
> OCD and Humphrey's absenteeism and conclude
> that MHA fired Humprhey because of her disability.

Most striking, for the purposes of Mitchell's case, is the comparison of MHA's behavior with the Army's behavior here. MHA, concerned about the employee's attendance, provided progressive written warnings, practical "tips" about her

rituals, counseling, oral warnings, and an offer to grant a leave of absence. The Army, on the other hand, appears to have insisted that Mitchell, against doctors' orders, personally deliver his FLMA documents to the very supervisors who had abused him, despite getting the documents from other means. The Army, instead of giving Mitchell warnings while he was recuperating, decided to ambush him by designating him as "AWOL" without telling him it was taking, or had taken, that course of action.[44]

### E.    Mitchell's Absence from Work Because of Medical Problems Does Not Constitute a Failure to Meet The Employer's "Legitimate Expectations.

At pages 14-15 of its motion, the United States contends that the Army had "legitimate, nondiscriminatory reasons" for its proposed Notice of Removal. These "reasons" **all** have to do with Mitchell's absence form work on and after February 10, 2005.[45]

To its motion, the government attaches Document 28, plaintiff's affidavit of April 9, 2006, marked as "Exhibit F" to the motion. Although the United States implies that its

---

[44]    In the Tenth Circuit case, *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 (10th Cir. 1997), plaintiff-appellant Aramburu contended that because of his Mexican ancestry, he was the object of disparate treatment culminating in Boeing discharge of his employment because of his frequent absences. In a fact-specific opinion, the Court of Appeals upheld summary judgment against Aramburu. The opinion notes that Boeing had a written sick leave policy, which included a progressive point system, and that the appellant's supervisors had sent him a series of corrective memoranda regarding his absences.

treatment of Mitchell's absence was reasonable, Mitchell swore

in that affidavit that he was on a heart monitor for 30 days,

and that Dr. Moss, his primary health provider, had confirmed in

writing that he should be on medical leave for 12 weeks.[46]

Mitchell, then and now, has noted that his supervisors were

aware of the views of nurse Carryer, as well as Dr. Moss, and of

his request for FMLA leave, and his "medical situation."[47]

Furthermore, on February 5, 2005, Mitchell notified Mr.

Moore that he was to avoid stress, but that contacts could be

made through his attorney, Mr. McDonough, and his fiancee, Robin

Boerner.[48]

Graciously conceding that Mitchell's "job performance may

have met minimal expectations when he was present", the United

States confines its contention that Mitchell failed to perform

to legitimate expectations to his absence.

In this Brief, *supra* at pages 2-7, the circumstances

leading up to and including his absence from work have been

described in detail.

Mitchell sent a lengthy e-mail to his superior, Mr. Moore,

on February 9.[49]  He pointed out that his primary care physician

---

[45]  The government states that Mitchell exceeded his sick and annual leave balance on February

[46]  Affidavit of John Mitchell, defendant's Exhibit F to its Motion, at page 5, paragraph 14.

[47]  *Id.*, page 6, paragraph 18.  See also page 6, paragraph 20.

[48]  *Id.,* page 6, paragraph 19, and Attachment 9 thereto.

[49]  Exhibit 14.

(Dr. Kirk Moss), in an attached letter, did not give any return

date. Mitchell explained that Dr. Moss

> . . . is requesting more medical test (*sic*) that he
> is not sure when they will be completed and he
> does not want me to be under any stress until
> all the medical tests and consultations are
> completed."[50]

He added that he was sending a copy of the medical notes to

the Fort Richardson Occupational Nurse, Ms. Carryer, "and she

will be kept in the loop." He invited nurse Carryer to call his

fiancee at home.[51]

Again, on February 9, 2005, Mitchell communicated to his

superiors and nurse Carryer by e-mail. On the next day,

February 10, Mr. Dunn acknowledged that communication, stated

that "(t)he doctor's note that you provided only stated that you

would be out until the 9th", and added that

> we are concerned for you (*sic*) welfare and are
> trying to ascertain when you might be coming
> back so that we can make the appropriate
> shift scheduling.[52]

A few hours later on February 10, Mitchell's fiancee,

responded that two notes had been provided, noting:". . . I

can't give you a calendar date as to when John will be able to

return." She also noted that Mitchell still wanted to go to

Iraq and take up "that GS-11 position the Colonel offered

---

[50] *Id.*, page 6, paragraph 19, and Attachment 9 thereto.
[51] Exhibit 15.

(him)."[53]

Under this record, the evidence is consistent with the idea that the supervisors, who were already the subject of a complaint lodged by Mitchell, while going through some motions, opportunistically took advantage of the circumstances to label Mitchell as "AWOL" and prepare to remove him as a civil servant.

**Part IV.   Conclusion.**

The motion to dismiss, or, in the alternative, for summary judgment, should be DENIED.

DATED December 20, 2006.

Respectfully Submitted

s/ Joe P. Josephson
912 W. 6th Avenue
Anchorage, Alaska   99501
Tel. (907) 276-0151
Facsimile (907) 276-0155
E-mail: jjosephson@aol.com
Alaska Bar No. 6102018


**Certificate of Service**

I hereby certify that on 12/20/06,
A copy of foregoing plaintiff's
opposition to the defendants'
motion to dismiss or in the alternative,
for summary judgment was served
electronically on Richard L. Pomeroy.


s/ Joe P. Josephson

---

[52] *Id.*
[53] Exhibit 15.