## AFFIDAVIT OF JOHN MITCHELL

UNITED STATES OF AMERICA  )
                          ) SS.
STATE OF ALASKA           )

JOHN MITCHELL, being first duly sworn, deposes and says:

1. I am the plaintiff in this action.

2. The United States of America, in its pending motion to dismiss or, in the alternative for summary judgment, asserts that I "alleg(e) that I wrote to Sandra Martinez on January 14, 2005, complaining of age and disability discrimination.

3. That I wrote to Sandra Martinez, Equal Employment Opportunity manager at Fort Richardson, on January 14, 2005, is not a mere allegation. It is unquestionably true. (Exhibit 1 [copy of e-mail sent on January 17, 2005]; Exhibit 2, copy of letter to Sandra Martinez, with attachment. It is to be noted, furthermore, that I sent copies of my e-mail to Brigadier General James T. Hirai, Commander, United States Army Alaska and Colonel Paul Reoyo, Chief of Staff. See Exhibit 1, "Cc" line.

4. The defendant's memorandum makes no mention of other documentation of mine from January, 2005. Attached as Exhibit 3 is a copy of a 17-page document I prepared, entitled "TALKING POINTS GRIEVANCE NARATIVE" (sic). Exhibit 3 was widely distributed. See Exhibit 4. Exhibit 4 shows that I distributed the TALKING POINTS GRIEVANCE NARRATIVE to nine persons in my chain of command, by certified mail, and that the mailing was received in January, 2005. The very first paragraph at page 1

is headed "Age discrimination". This broad distribution up the chain of command was recommended by Mr. David Moore, my immediate supervisor, who assisted me in writing the document.

5. The defendant's memorandum blandly states that I "left work due to illness on January 29, 2005." I was scheduled to work on January 29. Ahead of time, I notified my supervisor that I could not report for work because I had taken many shots, in anticipation of an assignment in Iraq, and that I had a fever.

I had taken nine shots on January 24, and a remaining shot on January 27. The shots were identified in a deployment packet given to me by Mr. Moore. The reason for the shots was that the Army wanted me to be in Baghdad within 30 days. Attached is a report from Occupational Health Nurse Elizabeth Carryer, at the Preventive Medicine Department, Fort Richardson, attesting to the adverse effects of the shots upon me. (Exhibit 5).

6. I was the oldest person working in the Command Center. Mr. Dunn belittled my physical capacities on frequent occasions. he referred to me as his "sick, lame and lazy." I recall one instance when I was attempting with others to move a group of small boxes containing individual telephones out of the way, because they were stacked up and impeding foot traffic, and Mr. Dunn stopped me, saying: "This is not a job for the sick, lame and lazy." He never made such remarks to younger people.

Affidavit of John Mitchell, page 2

7. Mr. Dunn said to me that it was nice for him to tell an older, former officer, what to do. He said: "I enjoy having you as one of my privates."

7a. On January 20, 2005, Mr. Moore came to the Command Center from another location and told me that he was instructed to "document" me and even back-date incident reports. He said he was also supposed to document any medications taken by me on the job, "up to and including aspirin", and report all of this to Mr. Dunn and Mr. Pressley. I explained to Mr. Moore that I took muscle relaxers and over-the-counter medications because of pain which was service-related. Mr. Moore responded, with a half-hearted laugh: "Well, then maybe you're too old to work any more."

8. On February 2, 2005, Mr. Dunn imposed on me a unique requirement that, to get sick leave, I had to get his approval in advance. He belittled Occupational Nurse Elizabeth Carryer, and my physician, Dr. Kirk T. Moss. He said he outranked the nurse and that "in some countries, I'm considered a doctor." Mr. Dunn considered himself "a doctor" because he was a former Army medic. He accused Dr. Moss of providing substandard medical care and medicines. He insisted that I go to the troop medical clinic for medical care, even though I was not authorized to do that: I am a disabled American veteran, but not a military retiree. Exhibit No. 6.

Affidavit of John Mitchell, page 3

9. Mr. Dunn's letter, Exhibit No. 6, is noteworthy also because the dates are obviously wrong, in that Mr. Dunn states that I was AWOL on February **29.** Mr. Dunn also was incorrect in saying that I was AWOL (referring to February 29, but clearly meaning January 29). Exhibit No. 7 is a work status report from Dr. Moss explaining my disability due to the shots and stating that I was or would be disabled on January 29. Dr. Moss certified that I had a fever and flu symptoms. As I remember, my fever on January 29 was 102.8.

10. I had called David Moore before January 29 that I would not be at work, that I was ill because of my shots, and that I had a doctor's note which I would bring with me when I returned to work.

11. I was called to work on February 2, 2005, to take a test. This was not my normal workday. I was still very sick. I reported as directed and I was given a test, which I failed. This was the only test I had ever failed at the Command Center, and I failed it because of by one question. Although Mr. Moore has denied it, he and I actually had had a conference call with nurse Carryer on January 27, 2005. He was told, she states at Exhibit 5, that she expected my fever to "last for several days. . .". According to her letter, Mr. Dunn said he would put me off duty until Monday, and she responded that she "didn't know

Affidavit of John Mitchell, page 4

if (I) would be ready by then." *Id.*

12. I returned to work on February 3, 2005, after David Moore told me in a telephone call that I was obliged to do that, even though I was still sick. During the call, I told Mr. Moore that I had a note from my doctor. He told me that I had to report and bring the doctor's note with me. (As noted above, in paragraph 8, Mr. Dunn, in writing, had told me that I had to present a doctor's note, in advance, before taking any medical leave).

13. On February 3, upon reporting per instruction to the office, I passed out and was rushed to Elmendorf Air Force Base Hospital. Exhibit 8 is a memorandum written by my supervisor, Mr. Moore, on February 3, 2005. His attention was drawn to me as I lay on the floor near the console carousel area "going into what (he) believed to be convulsions."

14. After that event, I was on Beta blockers and a heart monitor, and was told at the Alaska Heart Institute that I was not to allow myself to be stressed in any way. While I was an inpatient, in critical care ("I.C.U."), my supervisors were calling me. I am informed by others that they were told by Mr. Dunn that I was "faking" my heart problems.

15. Malcolm (also known as "Don" and "Donald") Pressley, Director of Plans and Operations for the U. S. Army, Alaska,

Affidavit of John Mitchell, page 5

and a civilian, came to my bedside, on February 3, 2005, while I was in I.C.U., ostensibly to deliver a "get well" card to me. Exhibit 9. However, he told me that the chain of command knew that I had "faked" my heart episode and that I had better get my act together. He obtained entry to my hospital room by telling the nurse and my companion that he had to talk about a "classified matter". They left the room and so I was alone with Mr. Pressley.

16. The defendant, through the United States Attorney, claims that Mrs. Wanita Pressley -- the spouse of Malcolm Pressley -- wrote to me on March 21, 2005, saying that Sandra Martinez did not get "an informal EEO complaint" from me, "electronically". Exhibit 10.

17. In that regard, my first observation is that I never got that letter until it came as a response to Freedom of Information Act requests. Exhibit 11. I received the letter from March 21, 2005, on April 20, 2005. Exhibit 10. The only copy I received did not contain her signature. The government has not provided any certified mail receipt that would suggest that I received Ms. Pressley's letter in March, 2005.

18. My second observation is that according to Warrant Officer Clifton Tillman, who attempted to review Ms. Martinez's

Affidavit of John Mitchell, page 6

e-mail account on July 14, 2005, there were "no e-mail messages prior to 8 Feb 05 contained in (Ms. Martinez's) "Inbox" and the "Sent Items" folder which had no history of outgoing messages from 29 Oct 04- - 31 (to) Jan 05." Exhibit 13. This finding raises the possibility, or even the likelihood, that my e-mail message to Ms. Martinez was discarded along with all other e-mail messages sent to Ms. Martinez between October 29, 2004 through February 8, 2005.

19. It was not until I received the response to my Freedom of Information Act requests that I learned that Malcolm and Wanita Pressley were husband and wife.

20. Between the date when I first hospitalized and the date when I submitted a letter of resignation, my understanding was that I was under excused absences through the Family and Medical Leave Act (FMLA).

21. I was stunned, and emotionally distressed, when Mr. Moore, in the Notice of Proposed Removal, stated that I was "AWOL" in that I failed to submit to him the documents for the Family Medical Leave Act of 1993 (FMLA) leave.

22. On February 10, 2005, Mr. Moore, at the end of his memorandum to me, did state:

> I will consider approving leave under FMLA if you provide me documentation showing you are incapacitated and awaiting medical tests and/or appointments."

23. At the time, however, I was instructed by my doctors

Affidavit of John Mitchell, page 7

that for medical reasons I was to have no contact with Mr. Moore or Mr. Dunn. I was under heavy medication during February.

24. It appears that Mr. Moore and Mr. Dunn refused to accept documentation showing my incapacity when nurse Elizabeth Carryer attempted to give documentation to them, after receiving documents from my attorney, Michael McDonough and myself.

25. Until the Notice of Proposed Removal, I had no knowledge that I was being carried as "AWOL".

26. FMLA documents have been in the possession of the United States, as shown by the government's presentation of those documents as an exhibit or exhibits. Furthermore, Dr. Moss faxed the FMLA documents to Mr. Dunn.

27. My superiors' use of the term, "AWOL", in reference to me, was deliberately calculated to do me emotional and financial harm. In late March, 2005, I discovered that the payroll voucher formed used in my case actually showed "AWOL" as my status. As far as I am concerned, there is hardly any term that is more of an epithet than that, especially as applied to a veteran such as me. It is especially inappropriate here, given my known condition, and the delivery of documents to nurse Carryer, the absence of any questioning of my right to leave or notice of any decision denying me leave, and the fax delivery of documents by Dr. Moss.

28. I perceived that my superiors were creating a very

Affidavit of John Mitchell, page 8

hostile and discriminatory atmosphere towards me.

29. At the time I submitted my initial letter of resignation, I was unaware of the Notice of Proposed Removal. The initial letter of resignation was written by me on April 5, and the civilian personnel center got it on April 7.[1] The Notice of Proposed Removal, dated March 31, 2005, was not mailed from the Eagle River Post Office (not from Fort Richardson) until April 7.

30. If I had been recognized as resigning on May 1, 2005, as I asked to be the effective date in my letter of resignation, I would have been allowed to keep health insurance, and I would have received a federal disability stipend (which would have paid for the insurance), and I would have been able to retain participation in the federal Blue Cross/Blue Shield program. I do not have a disability stipend and I am ineligible for federal Blue Cross/Blue Shield. I also lacked the resources take part in COBRA. Mr. Dunn was aware of all of these difficulties, because I discussed them with him.

31. At about this time, I was being thwarted in my efforts to learn the status of my EEO complaint and to get documents I asked for through the Freedom of Information Act. I finally got the documents after the date of my resignation (constructive discharge).

---

[1] Exhibit ___.

Affidavit of John Mitchell, page 9

32. In April, 2005, I determined that I had no reasonable alternative except to resign, under the pressures and conditions which were imposed upon me. I believe that no reasonable person -- especially a veteran -- could expect to have a endurable workplace environment under the circumstances, including a superior who branded me as "AWOL", a superior who declined to accept FLMLA documents because they were not personally handed to him by an ill employee, and taking into account the matters set out above and in my prior affidavit. In submitting my resignation, I considered that my age, and the comments and attitude about my age and past service, were factors in the treatment I was receiving which necessitated the "resignation".

DATED December 19, 2006.

*/s/ John Mitchell*
John Mitchell

SUBSCRIBED and sworn to before me, a Notary Public in and for Alaska, this 19th day of December, 2006.

My commission expires: _____