# TALKING POINTS
# GRIEVANCE NARATIVE

1. **Discrimination:**

   a. **Age discrimination.** Mr. Dunn has told my coworkers about how humiliating it is for me to take a GS-5 position at my age and with my level of military and civilian education.

   b. **Discrimination based on Disabilities.** Mr. Dunn has alluded to the fact that my service connected injuries were self-inflicted and that I inflated the extent of the injuries for personal financial gain.

2. **Harassment:**

   a. **Yelling at employees.** Many times Mr. Dunn will come to work with an attitude and will start the day by throwing a temper tantrum. Examples:

   1. When Mr. Dunn comes in during the morning, he wants to know three things: the location of the key staff, the status of communications with higher headquarters and subordinate units, and the content of the daily brief. However, from time to time, there are some other requirements we are required to track. During the firefighting campaign last summer near FT. Wainwright, the Bureau of Land Management (BLM) informed the UCC that updated fire information would not be available for another couple of hours because during the night there had been a significant change in the intensity and direction of the fire and new data was being collected. Mr. Dunn, was briefed about this delay and he began yelling and telling the controller team

3

how incompetent we were and making threats about suspending or firing the controllers on duty. Because according to Mr. Dunn the controller team was not on top of the situation and was improperly carrying out their duties.

2. Mr. Dunn likes to yell and threaten controllers for using note pads and pens for taking notes pertaining to phone calls to the UCC. The chief threat is that he will suspend or fire a controller for using a note pad and pen. He prefers using a grease pencils and writing on a copy of an incident report, in a document protector, even before you figure out if the purpose of the call is to report an incident.

All the Incident Reports have a template on the computer and the controller use to can bring up the templates, on the screen, and take down basic information on a note pad. As anyone who takes phone calls understands, many times, it is hard to determine what has happened, the time line, and sorting out the characters involved. Who, what, where, when, why, and how is apparently outdated at the UCC. Once I had, a call from the FWA MP Desk Sergeant telling me about a stolen vehicle, they had recovered and they had apprehended the car thief. However, the MP Sergeant kept going off on tangents. It took almost 20 minutes to collect the information and the about multiple characters involved and to sort through the information before I could be sure who the vehicle belonged to, who took it, who the thief was trying get the MPs to give the vehicle to (a buddy who asked him to steal it and was not the owner), and who where the innocent people that had stopped

to render assistance when they saw the vehicle go off the road and into a ditch. I had a total mess to straighten out and using a grease pencil on an IR template in a document protector would not have been sufficient. However, if Mr. Dunn had been present I would have been threatened with a suspension or firing.

**b. Threatening firings and suspensions.** This is a favor tactic of Mr. Dunn. I have been threatening with being fired two or three times a week since I started working at the UCC for the silliest of reasons that can be easily substantiated. One particular event that was awkwardly handled was Mr. Dunn's investigation of the loss of a **keyed Sectera Wireline Terminal, a controlled Cryptographic Item.** On October 14, 2004 at 1300 hrs Mr. Dunn called a meeting of the entire UCC staff. The UCC time sheets can verify that this unscheduled meeting took place. During the meeting, Mr. Dunn told us that the Sectera that he had keyed and left in an unsecured conference room was outside of the controlled access area of the UCC was missing. Mr. Dunn blamed the controllers for the item being missing and told everyone that we were going to split up the cost of the item (I have been told the cost is approximately $50,000) because he would not bear this burden alone. The fact is the item was never placed on the COMSEC Daily Shift Inventory so the controllers where not inventorying the Sectera and the controllers had no idea that the item was keyed. By not having the item on the Shift Inventory and not secured in the COMSEC safe the controllers had no idea that the devise was even issued to the UCC so nobody thought anything of the item being left by Mr. Dunn on a

conference table in an unsecured room. Mr. Dunn for blamed the staff for his incompetence and threatened a mass firing of the UCC personnel for his incompetence. After more than a 3-hour search Mr. Tom Anderson found the item in an unsecured box under some papers. This is a COMSEC violation and I am not entirely certain whether it was reported to the proper competent authorities as Mr. Dunn went on a tyrate about how we had lost all our credibility for his security breach.

**It needs to be understood by everyone that Mr. Dunn has one iron clad rule, in the UCC that I am violating with filing this grievance that he will immediately dismiss anyone for violating. This rule states that there is a cone of silence over the UCC and nothing that happens or is said in the UCC is to be talked about outside the UCC or inside the UCC to anyone that does not work in the UCC to include Mr. Pressley, Mr. Miller, COL. McClain, Col Reoyo, and the CG. This rule is not meant to protect the security of the UCC documents and equipment but is to protect Mr. Dunn's totalitarian regime.**

c. **Condescension.** Mr. Dunn likes to talk to me in a very condescending manner. He frequently speaks to me as if I were a three-year-old child and that I am too stupid to understand the simplest of things. A good example is when Mr. Dunn starts yelling at me to "Focus" "Focus." I have also seen Mr. Dunn use this tactic on several other controllers. But they are big boys and can file their own

grievance. This usually happens when there is a violation of some perceived policy. I use the word perceived because Mr. Dunn dose not have any policy letters, at least ones we have been informed about, and what is correct procedure today is wrong tomorrow and sometime procedures change from the morning to the afternoon depending on his mood. Right after I started working at the UCC Mr. Dunn threw a temper tantrum when he asked me about security labels. I told him there were four types of labels: Top Secret, Secret, Confidential, and FOUO. Mr. Dunn blew up and began screaming at me to focus and that I was incompetent because FOUO was not a designated security classification. Then he went off on how I was a total incompetent about everything I did. When I pointed out to Mr. Dunn that he did not have any written policies about how things where to be done in the UCC Mr. Dunn told me that he was talking and to shut-up and then scolded me some more. I was told that I may have been a Warrant Officer, when on active duty, but in his organization I had no authority to do anything. I told him that everything I did I always asked my senior controller or his NOCIC SFC Tom Anderson for permission, or to proof read my work, Mr. Dunn responded that he did not care if my supervisor gave me permission. The he, Mr. Dunn was the only one in charge here. After that I quit displaying all initiative as doing something as simple as posting a code book supersession message was above my authority to decide. If I do anything except what Mr. Dunn tell me to do both myself and Mr. David Moore my immediate supervisor gets scolded, many times with profane language. The

scoldings come from doing things like backing up the computer or filing old duty logs.

When Mr. Dunn ever wants an explanation as to why I solved a problem in a particular way he waits until I start my explanation and then yells "Shut-up I am talking" and then he begins to scold me. Then he asks for me to explain myself. When I try to tell him my side of the story, a second time, he always comes back and starts yelling something to the effect "Obviously you did not hear me what did I just tell you." What he wants me to do is give repeat the story he has fabricated and is not interested in the facts as I used in coming to the conclusions the I based my actions. Basically, Mr. Dunn is just looking for an opportunity to try to humiliate me. As he is fond of saying, "I am a GS-12 I don't make mistakes."

3. **Hiring Practices:** When I was first interviewed, in November 2003, for the job as an Emergency Actions Assistant, Mr. Dunn asked me why I was willing to work as a GS-3 at Elmendorf and then come to work at the UCC as a GS-5. I explained to Mr. Dunn that I received a 100% disability from the VA in 1991. To get money to rehabilitate myself I had go to school and take out a lot of student loans. I used the money from my VA disability check to insure that my children where taken care. Each of my children got $500.00 a month to insure they wanted for nothing and I kept $600.00 a month to live on. For several years, I lived as a homeless person and attended school in

order to qualify for the loans. I slept in the back of my truck or in a tent and used the money from the student loans to pay for schooling, surgery, and physical therapy.

I told Mr. Dunn that many jobs I applied for most prospective employers had a tendency to hire their friends. To my surprise Mr. Dunn asked what was wrong with hiring your friends he does it. Then he said there is nothing wrong with taking care of your friends. I also explained to Mr. Dunn that when employers found that I had a severe disability that would end my interview. I cannot prove it but I believe it because most people are afraid of workman computation claims making. Since I could not get hired it impossible for me to develop a work history other than volunteer work. The reason for me taking a GS-3 job at Elmendorf a GS-5 job at the UCC was to build a work history. I also informed him that I did volunteer work because I refused to become one of the stereotypical veterans the media and movies like to portray as a useless alcoholic. I had to prove to my children that despite adversity you never had to give up your self-respect.

As a result of my schooling and rehabilitation, I received an Associate Degree (Liberal Arts), a B.S. in Technology (Electronic), a B.A. in Anthropology, and a M.A. in Interdisciplinary Studies. I am very proud of the fact that I never took a penny of welfare or used a social service agency. But I do get

frustrated at the amount of discrimination I have faced as a disabled veteran. Once I even had urine thrown on me by some punk kids that raided and tore-up my camp.

At the time, Mr. Dunn offered me the job, as an Emergency Actions Assistance, he told me that he was upgrading the jobs to a GS-5, GS-7 and, GS-9 progression and that I would be would be a GS-7 around June or July of 2004 and a GS-9 a year later which would be around June or July 2005. Mr. Dunn further told me that he was going to send me to two COMSEC Courses because I had attended the courses about 20 years ago years ago and needed to become current again. While in the Army I was a Communications-Electronic Maintenance Technician (256A) and prior to that I was a Communications Sergeant 31G4V in the 1st Ranger Battalion. One of the courses Mr Dunn told me I would be attending was the Hand Receipt Holders' Course and the other was the COMSEC Custodian Course. I am still waiting to go to either course. After I started working at the UCC on January 11, 2004; Mr. Dunn reiterated that I would be a GS-7 around June or July and a GS-9 in June or July 2005. To this date, Mr. Dunn has done nothing to up grade the jobs positions.

At the November 2004, training meeting Mr. Dunn announced that if a GS-9 Senior Controller Position came open Mr. Tom Anderson would receive the promotion first and Ms. Donna Sailor would get the position second. He also made reference that John Vegas, myself, and James Newell would be considered for a GS-9 position when he felt we were ready. Even though all

8

three of us have seniority over Mr. Tom Anderson and Ms. Donna Sailor. Mr. Dunn further stated if possible Mr. Tom Anderson was going to get the GS-11 job coming open in the USARAK G-3 Air Shop.

Mr. Dunn also announced that Mr. Kurtis Doan would be getting the new IT position he was creating. After the meeting I requested, from Mr. Dunn, to be considered for the IT position and pointed out to him that my prior MOS and my BS in Electronics Technology more than qualified me for the position. But Mr. Dunn told me that the job belonged to Mr. Kurtis Doan. Mr. David Moore even approached Mr. Dunn during a private meeting, in Mr. Dunn's office, about allowing me to be considered for the job but was told by Mr. Dunn, that he did not feel I was qualified for the job and if I applied I would not even be considered.

A couple of months earlier, Mr. Kurtis Doan told both Mr. David Moore and me that Mr. Dunn had promised him a GS-9 before he went to Korea but because he was caught on stop loss, he could not get one of the GS-9 Controller jobs and he was angry about having been cheated but Mr Dunn said he would take care of him. I think if you check Mr. Doan who was hired as a temporary hire to fill in for John Vegas was hired with out the position being advertised but I cannot be sure about this. Also, Mr. Tom Anderson and Ms. Donna Sailor were hired straight from active duty without the job being advertised. This is a complete double standard.

During the December 2004 training meeting. Mr. Dunn said that because he did not use the words "I promise" when he hired certain people there was no guarantee that the promotions. He was looking directly at me when he said this. Mr. Dunn also announced that he was going to try and upgrade his position when he gets his new computer room is up and running so that he could get out from under Mr. Pressley (who is also a reserve officer) and run the whole program down stairs.

Over the past year Mr. Dunn has expressed many time that Mr. Pressley was too incompetent to be his supervisor. He has made similar comments when COL. Reoyo was appointed Chief of Staff and when Mr. Hank Carlson was his boss he would always remark about how he had to work under the most incompetent supervisors.

Dennis has a big problem with officers and I have heard him talk to officers over the phone. One person that I heard only Dennis's side of the conversation was with (I was told) was the as the Battalion Commander of the 59th Signal Battalion. Dennis was upset that the officer was not dedicating enough people to get his new computer room up and running even though it was (as I have been told) was not budgeted. He talked to the officer worse than I would ever talk to a dog. Dennis has bragged to me on many occasions

that he is the equivalent of an O-6. Verify this with Mr. David Moore as he also heard the conversation.

4. **Policy.** The USARAK Command Center has no policy letters. I rewrote and revised the UCC SOP to get us through the US Army Pacific Staff Assistance Visit (USARPAC SAV) but nobody has any idea what the policy is from day to day and the SOP is just so many words on a page.. The policy of the moment all depends on how Mr. Dunn feels and if he wants to humiliate someone because he is having a bad day.

5. **Favoritism**. Mr. Dunn plays favorites with the UCC staff. For example, when I was trying to have my Service Computation Date Corrected I approached Mr. Dunn several times. In August 2004, I approached Mr. Dunn for the last time but Mr. Dunn did not want to look at my documentation. Several times, in the past, I tried to get him to look at my documentation but he always blew me off. Finally, in November 2004 I decided that I was going to take my case to the Inspector General. I informed Mr. David Moore my direct supervisor and Mr. Moore said he was going to call Mr. Dunn and asked that I approach Mr. Dunn one more time. I did as I promised and went to see Mr. Dunn the next duty day. Within 2 weeks, the IG corrected my SCD. Later I found out that Mr. Dunn had put the word out to my coworkers that I was just going to embarrass myself. However, when CPOC did correct my SCD I tried to tell Mr. Dunn and he acted as if I was not even there so I sent him an e-mail that he has never responded to me.

On May 24, 2004, I had major surgery and Mr. Dunn asked me to let him know where I was at so he could visit in the hospital. My girlfriend called the UCC and tried to tell Mr. Dunn the room number at Providence Hospital. Mr. Dunn totally blew her off. The only member of the UCC staff to come visit me was Mr. Moore. Mr. Dunn did not even make a phone call to see how I was doing for the entire 3 weeks I was absent from work. But he did make a very sarcastic remark about how I failed to keep him informed of how I was doing while I was on sick leave.

While this example does not directly affect me, it highly offends me. and effects, my immediate supervisor, Mr. Moore. On April 28, 2004, the UCC received an award for Outstanding Federal Employee of the Year Category V. However, Mr. Moore had his name left off the award even though he is responsible for getting the UCC Staff proficient enough to pass the monthly mandatory examinations and did the yeoman's work for getting us a satisfactory rating on the USARPAC SAV. Mr. Dunn told Mr. Moore that he would get the certificate corrected and put a correction in the post newspaper but as of January 1, 2005, there has been no correction. I cannot, in good conscience, accept my certificate because I cannot bring myself to profit or take the credit for Mr. Moore's hard work.

Mr. Dunn has notified the GS-5s that he does not want to talk to us except through a GS-9. However, the exception is for the personnel that worked for him while on active duty, Mr. Tom Anderson, Ms. Donna Sailor, and Mr. Kurtis Doan. This has

made it impossible for me to talk to Mr. Dunn about these problems so I have hired an attorney to represent me.

Another thing Mr. Dunn has done is to have the USARPAC SAV Team remove the names of the personnel that scored a 100% on the SAV EA Test. One of the 3 names was mine and another name was James Newell but since we did not work for him in the Army we are not on his list of favorite people.

Finally, I would like for the G-3 to take a look at the UCC time cards for the months of June, July, and August 2004. During this time Tony Erne and James Newell were claim night differential while at the same time as they were on day shift. I do not know if the money was ever paid back but I was told by Tony "it was their problem."

5. **Alcohol.** Many times when Mr. Dunn goes off the deep end, I can smell alcohol on his breath and from time to time several other people appear to act a little intoxicated. Making me believe that alcoholism is a common problem in the UCC and needs to be investigated by the command.

6. **We are not Soldiers.** Mr. Dunn continues to insist that we are still soldiers and that he is our 1st Sergeant. Mr. Dunn needs to understand that we are all veterans, we are Department of the Army Civilians, and we need to be treated as such.

EXHIBIT 3
PAGE 13 of 17

7. **The Dumbest thing Mr. Dunn has ever said to me.** One day Mr. Dunn told me he was angry because I was a member of the 1st Battalion 75th Inf. And he always felt he should have been a member of that 1st Battalion. But always had to settle for being a member of the 2nd Battalion. I often wonder if Dennis is off his medication.

# WHAT I WANT TO REMEDY THE SITUATION

1. I want an immediate end to all harassment, condescension, threats, yelling, and belittling by Mr. Dunn. Furthermore, I want a specific, by name, public and written apology by Mr. Dunn for the way he has treated me. I want Mr. Dunn to start treating me with respect and ask that the G-3 or another military officer designated by him be present at the apology along with Mr. Pressley to be in attendance to witness the apology along with my attorney. To be included in the apology Mr. Dunn must:

    a. Apology for questioning my disability.

    b. An acknowledgement by Mr. Dunn that he has made it a habit of talking down to me as well as engaged in age and disability discrimination, all harassment he has unleashed upon me, talking in a condescending manner, the threats he has made against me, yelling, and belittling by Mr. Dunn.

    c. I want a general apology from Mr. Dunn for the way he has also harassed, talked in a condescending manner, threats, yelling, and belittling the UCC personnel in general.

EXHIBIT 3
PAGE 14 of 17

2. I want an iron clad guarantee, by the G-3, that there will be no retaliation for me for having submitting this grievance through my attorney and that Mr. Dunn's actions will be strictly monitored by the G-3 chain of command.

3. I want no further discussion of this matter by Mr. Dunn to any individual affiliated with the DoD or other Governmental Agency and I do not want Mr. Dunn to mention this action to any member of the UCC staff until the matter is resolved.

4. I want Mr. Dunn to live up to his promise to promote me to GS-7 backdated to June or July, with back pay, and a promotion to GS-9 by June. I want a specific date in writing that this action will take place. Furthermore, I will not lose any seniority or suffer any adverse action pertaining to my career conditional status. On January 11, 2006 I become career status. In the event this is not possible I would like the G-3 personally to conduct a good faith negotiation with my attorney to remedy this problem to the satisfaction of everyone concerned. I am asking my attorney to ask that the IT job not be filled until this negotiation is completed as I was not allowed to apply for the job, by Mr. Dunn, and I would like to get a promotion with an equivalent pay grade and salary as the IT position pays. Even if this means that I have to leave my job at the UCC to maintain harmony in the command.

5. I want to attend the two COMSEC Courses that Mr. Dunn told me I would attend at the earliest possible date. However, should I leave the UCC I would like to attend at least one course in residence, at the earliest possible date, to compensate me for not having the chance to attend the promised military schools mentioned above. The purpose in this is to assist me in transition to a new job if that is the outcome of the negotiations mentions above.

EXHIBIT 3
PAGE 15 of 17

6. I want to have all of Mr. Dunn' hiring authority suspended and given to Mr. Pressley or another competent person with integrity in the G-3.

7. I want Mr. Dunn to be required to, immediately, write a series of policy letters so that the UCC personnel know the proper procedures to be followed in all situations and that the procedures in these policy letters are adhered too. Further more I would like these policy letters to be reviewed by a competent representative of the G-3 or a SJA.

8. I would like specific questions asked of the UCC personnel by whomever is appointed to investigate my charges without Mr. Dunn being present to intimidate them. If my attorney deems it appropriate I will also like to provide questions that I want each person to be asked under oath and that the investigation be conducted as an AR 15-6 investigation and that my attorney or his representative be allowed to attend all questioning.

9. I want all these items completed by a specific date guaranteed to me in writing. Should the agreed upon date not be met I want a daily monetary penalty assessed against the US Army.

10. I want the IT job to be properly advertised and opened to the public as well as all other pre-selection of employees to be ended. Including jobs that the Senior NCOs from the G-3 like to brag in the UCC that will guarantee them employment usually at the GS-11 or GS-12 level. Some of these people that I will mention to my attorney have bragged about their good fortune and I have witnessed them retiring one day and showing up on the following Monday as a civil servant after having claimed to have written their own job description and pay grade.

12. I want Mr. Dunn to remove his self proclaimed "cone of silence" over the UCC and that absolutely no reprisals be directed at anyone in the UCC. I have taken this action on my own without the knowledge of my coworkers and want them to have frequent contact with a representative other than Mr. Dunn so that concerns and complaints can be brought to the attention of the G-3 without being retaliated against.

13. I want Mr. Dunn to be required to have a command directed psychiatric exam and to attend anger management and possibly substance abuse counseling if it is warranted by a health care professional.

EXHIBIT 3
PAGE 17 of 17