DEBORAH M. SMITH
Acting United States Attorney

RICHARD L. POMEROY
Assistant U.S. Attorney
222 West Seventh Avenue, #9
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail:  richard.pomeroy@usdoj.gov

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOHN MITCHELL, | Case No. 3:05-cv-00264-JWS |
| Plaintiff, | **DECLARATION OF DAVID A. MOORE** |
| v. | |
| PETE GEREN,<br>Acting Secretary of the Army, | |
| Defendant. | |

## DECLARATION OF DAVID A. MOORE

I, David A. Moore, declare that I am an Emergency Actions Senior Controller for the G-3, Plans and Operations Division, US Army Alaska Command Center, Fort Richardson, Alaska.  I make the following five (5) page declaration in accordance with 28 U.S.C. § 1746.  I am aware that this declaration may be filed with the United States District Court for the District of Alaska.  I also understand that this declaration is the legal equivalent of a statement under oath.  I make this declaration based on my own personal knowledge as well as on information available to me in my official capacity. If called as a witness I would be competent to testify to the following facts:

1.     I am an Emergency Actions Senior Controller for the G-3, Plans and Operations Division, US Army Alaska Command Center, Fort Richardson,

Alaska. From January of 2004 through April of 2005, I was the immediate supervisor for Mr. John A. Mitchell.

2.    Mr. Mitchell became sick on or around January 26, 2005 after taking numerous immunization injections. On January 28, 2005, I was informed at shift turnover that Mr. Mitchell would not be present because he fell ill from the immunizations. Mr. Mitchell called me and informed me that he was having reactions due to the immunizations and may be contagious. I called the Occupational Health Clinic and spoke with Ms. Liz Carryer, Occupational Health Nurse. During a conference call with Ms. Carryer, Mr. Mitchell and I, Ms. Carryer informed both of us that Mr. Mitchell should not be contagious and that the reactions he was having were common upon receiving so many immunizations at one time. Ms. Carryer informed Mr. Mitchell that the normal procedure for immunizations involved processing through her clinic prior to getting orders overseas. Mr. Mitchell stated that he had gone to private office to get the shots.

3.    During the conversation between Ms. Carryer, Mr. Mitchell, and myself, I was concerned about when Mr. Mitchell would be able to return to work. During the conversation, Mr. Mitchell stated that he would be back at work on January 29, 2005.

4.    On Saturday, January 29, 2005, Mr. Mitchell was scheduled to appear for work at 0600 a.m.. Mr. Mitchell never called to state he was unable to report for duty, either before his shift was set to begin at 0600 a.m. or after his shift started. After 0900 a.m. on January 29, 2005, I called Mr. Mitchell at home to determine his intentions. I spoke to Mr. Mitchell's girlfriend, Robin, who informed me that Mr. Mitchell would not be coming to work and that he had a note from his doctor. Within a few minutes of talking with Robin, Mr. Mitchell got on the telephone and stated that he forgot about the note and that he had informed the Command Center he would not be in.

5.    All telephone calls into the Command Center are recorded as the nature of the telephone traffic is critical. I reviewed the audio log for the Command Center and could not find a conversation between Mr. Mitchell and the Command Center discussing him not coming to work. The only call the Command Center received from Mr. Mitchell was at 8:07 p.m. on the Feb 28, 2005 from Mr. Mitchell requesting a chaplain for guidance concerning a deployed soldier not attached to US Army Alaska.

6.    I informed Mr. Mitchell that it was imperative that Mr. Mitchell inform the Command Center if he is not going to be at work. I informed him that he needed to contact me no latter than 30 minutes after his 0600 a.m. shift began to alert me of his absence. I explained to Mr. Mitchell that the Command Center needs two Emergency Action Assistants to fulfill its mission. His failure to alert the Command Center chain of command regarding his absence left the center undermanned.

7.    On February 2, 2005, the USARAK Command Center underwent a scheduled Staff Assistance Visit by the Alaskan Command Staff Assistance Team. All Emergency Action Controllers of the USARAK Command Center were informed the previous month that the Emergency Action Certification Examination would be administered by the Alaskan Command Staff Assistance Team. All Emergency Action controllers to include Mr. Mitchell took the certification exam. After a review of exam results, Mr. Mitchell was the only controller who failed the examination. Successfully passing the Emergency Action Certification Examination is pre-requisite for all controllers to perform their job. All controllers must pass this examination. Mr. Mitchell never successfully passed the Emergency Action Certification Examination between the time he failed the exam on February 2, 2005 and his resignation on April 5, 2005.

8.    Mr. Mitchell was counseled for failing the Emergency Action Certification Examination on February 2, 2005. Mr. Mitchell was informed that successfully passing the exam was a condition of his employment. Mr. Mitchell was also counseled by Mr. Dunn regarding his AWOL, failure to alert the command that he would absent prior to the start of his shift.

9.    On February 3, 2005, Mr. Mitchell reported to work at 5:30 a.m.. Upon my arrival at 05:45 a.m., Mr. Mitchell presented a medical note. I was involved with the shift changeover at this time and asked Mr. Mitchell to wait for me to finish the shift changeover. Five minutes later, I reviewed Mr. Mitchell's doctor's note. While I was reading the note, Mr. Mitchell kept insisting that he was ready to re-take the exam he failed the previous day.

10.    I calmed Mr. Mitchell down and reviewed his note again. Based upon what the doctor's note stated ("Temporarily unable to resume work activities because such activity could place him/her or co-workers at risk.), I informed Mr. Mitchell that I needed to alert Mr. Dunn, my supervisor and Mr.

Mitchell's second-level supervisor. I called Mr. Dunn and let him know we had an issue regarding manning the Command Center. Soon thereafter, I turned to find Mr. Mitchell on the floor of the Command Center having convulsions. I immediately contacted medical emergency personnel for assistance.

11.    On February 5, 2005, Mr. Mitchell sent an e-mail to me stating that he had been ordered not to return to work by his doctors until they determined the cause of his medical problems. He stated that he would not take "any phone calls or visits except from family, medical personnel, and my legal advisor." He also stated that he would let me know as soon as his status changed.

12.    On February 9, 2005, I tried to call Mr. Mitchell twice to discuss when he would be able to return to work. Both times no one answered my telephone call and I left a message on each occasion. After I left work on February 9, 2005, I checked my personal e-mail from home. I had an e-mail from Mr. Mitchell that consisted entirely of an image of a doctor's note. The note was hard to read and did not give a specific date for Mr. Mitchell's return to work. I responded to the e-mail explaining that I had a hard time reading the doctor's note and did not see dates when Mr. Mitchell expected to return. I asked that Mr. Mitchell contact me through the Command Center by telephone or my official e-mail at the Command Center.    Mr. Mitchell never contacted me again after he submitted the illegible doctor's note on February 9, 2005.

13.    In response to Mr. Mitchell's February 5, 2005, e-mail, I drafted a letter dated February 10, 2005. In this letter, I explained that his last statement in the February 5, 2005, e-mail ("I wish to keep you informed of my status so I can have a health care professional explain my status to the Operations Manager of the Command Center as he is incapable of understanding the last doctor's note on his own.") was rude and insulting. I advised Mr. Mitchell in my letter that further insubordinate action will result in appropriate disciplinary action.

14.    Regarding Mr. Mitchell's statement that he would not take calls or visits from anyone other than family, medical personnel or his attorney, I explained in my February 10, 2005 letter that nothing Mr. Mitchell had provided to the command to date excused him from following the correct

leave requesting procedures. I further explained that Mr. Mitchell had exhausted his sick leave and was currently on annual leave.

15.     I explained to Mr. Mitchell in my February 10, 2005 letter that the medical documentation he had submitted was unclear, told me nothing of his limitations or any expected return date. I directed Mr. Mitchell to contact me upon receipt of the February 10, 2005 letter to confirm his leave status and his medical situation. Nothing that Mr. Mitchell had provided me prior to February 10, 2005 exempted him for the requirement to provide medical documentation sufficient to properly access his leave status.

16.     Finally, my February 10, 2005 letter informed Mr. Mitchell of his rights under the Family and Medical Leave Act (FMLA). I informed him that I need a written medical certification before I could approve leave under FMLA. I enclosed the Form WH-380 Certification of Health Care Provider to assist Mr. Mitchell in providing me with the necessary medical information to decide his FMLA leave. At no time did Mr. Mitchell, or anyone on his behalf, submit the requested FMLA paperwork to me as I instructed.

17.     I e-mailed a copy of my February 10, 2005, letter and reference attachments to Mr. Mitchell on February 10, 2005. I received e-mail verification that the e-mail and attached February 10, 2005 letter had been successfully relayed to Mr. Mitchell e-mail address. Additionally, hardcopies of all the documents were mailed by regular and certified mail to Mr. Mitchell's physical address. On February 23, 2005, the initially mailed hardcopies were returned to the Command Center. The entire packet was re-mailed to Mr. Mitchell on February 23, 2005 to his post office box.

I declare under penalty of perjury that the above statement is true and correct.

Executed this _15_ th day of June, 2007.


_David A. Moore_
David A. Moore
Senior Emergency Actions Controller