Joe P. Josephson, Esq.,
Alaska Bar No. 6102018
Attorney for Plaintiff
912 W. 6th Avenue
Anchorage, Alaska 99501
Tel. (907) 276-0151
Facsimile (907) 276-0155

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOHN MITCHELL, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES OF ) <br> AMERICA, et al., ) <br> ) <br> Defendants. ) | Case No. 3:05-cv.-00264 JWS |

**AFFIDAVIT OF JOHN MITCHELL**

UNITED STATES OF AMERICA  )
                          ) ss.
STATE OF ALASKA           )

JOHN MITCHELL, being first duly sworn upon his oath, deposes and says:

1. I am the plaintiff in this action.

2. I have read the portion of the United States's Motion for Summary Judgment, at pages 2-4, and will in this affidavit correct and clarify some of the statements contained therein.

3. At page 2, the government's Motion states that (Mitchell alleges) that an electronic mail (e-mail) was sent to Ms. Sandra Martinez of the EEO Office on or about January 14, 2005, complaining of age and disability discrimination. A copy of my e-mail to Ms. Martinez, dated January 17, 2005, is attached.

(Attachment 1).

4. At page 3, the government's Motion states that I left work due to illness on January 29, 2005. I became ill because I had accepted an offer to work in Iraq, for the United States Army, but was told that I would need to be prepared to leave within a month. My illness was a reaction to a series of shots, all given to me at once, which were needed for my service to the country in Iraq.

5. On the same page, the Motion states that I returned to work on February 3, 2005 where I subsequently became ill and was temporarily hospitalized. I actually returned to work on February 2, per order. I was instructed to take an examination on that day. I said that I was too sick to take the examination, but I was required to take it anyway. Despite being ill, I scored 84%, or just 6% below requirement. Defendant Dunn used my 89% score as a pretext for terminating me. He stated I would be terminated if I did not pass the test within 72 hours, even though he knew I was too ill to work.

6. I saw Dr. Moss on February 2, later on the same day. I was running a fever of over 102 degrees the morning I took the test. Dr. Moss reported that I was temporarily disabled from work until February 5. (Attachment 2). The Government's Brief does not note that I was under physician's care by Dr. Kirk Moss, of Eagle River, Alaska. Dr. Moss gave me a physician's slip for absence from work between January 24, 2005, and January 31, 2005.

7. In a memorandum dated February 2, 2205, defendant Dunn wrote that I was absent without leave on Saturday, January 29,

Affidavit of John Mitchell                 2

2005. However, I had presented to him the physician's slip from Dr. Moss which reflected my disability on that date. Mr. Dunn replied that he did not care about what the doctor thought and he even accused Dr. Moss of having provided substandard medical care to me.

8. Elizabeth Carryer, a registered nurse employed at Fort Richardson by the Department of the Army, wrote a memorandum about my reaction to vaccinations and confirming that she did not know if I would be ready to return to work by Saturday, January 29. (Attachment 3). Nurse Carryer spoke with my immediate supervisor, Mr. David Moore. She wrote that at the end of the conversation, she understood that I was going to be off at least until Monday and then that I would return to work only if my symptoms had abated. (Attachment 4). When confronted with Ms. Carryer's professional opinion, however, Mr. Dunn said that he didn't care what she had to say, and that he was a G.S. 12 and she was only a G.S. 11.

9. Dr. Moss gave me a supplemental written work status report saying that I was disabled from work between February 2 and February 5, 2005. (Attachment 5). On the morning of February 2, my temperature was 102.8. (See paragraph 6 above). On that day, I told Mr. Dunn that my temporary disability would likely be extended. He replied that he and he alone would decide if I were sick, and he commanded me to show up for work on the following day, February 3.

10. Contrary to any suggestion in the Government's Brief to the contrary, I kept my supervisor aware of the state of my

Affidavit of John Mitchell                  3

health and the status of my ability to perform work as reflected by opinions of my health care provider. There was a time, later on, discussed below, when I asked that any questions be referred to my former lawyer, Mike McDonough, or my fiancee, because I was advised to avoid stress.

11. I wish also to note that I was hired under the Veterans Readjustment Act, as a result of service-connected post-traumatic stress disorder (PTSD). My supervisors were aware of the nature of the hiring and of that condition. They also know that even when I was feeling well, I took medication for PTSD issues, including migraine headaches and related back pain.

12. I reported for work as directed on February 3. I attempted to show Mr. Moore a second note from Dr. Moss intended to allow me to be off work until February 5. Mr. Moore refused to read the note. He said that I had failed the test which I had taken on the previous day, in a sick condition, and that I had three days to pass the test. I answered that I was barely able to drive, and could not read because of my fever. He told me to wait for Mr. Dunn, who would decide if I were sick. I sat down in a chair. I tried to study test-related material. But my next memory is waking up in the Elmendorf Hospital Emergency Room. I have no idea of how I got there or what happened.

13. A few minutes after I woke up, a hospital employee brought me a telephone, because I had a call. The caller was Mr. Moore. He told me that I'd suffered a heart attack at the office. I have no memory of having talked to a doctor before that call.

Affidavit of John Mitchell                 4

14. The Government's Motion, at page 3, states that my illness which began on February 3, 2005, and for which I was temporarily hospitalized, resulted in my 'permanent absence from work.' During the period after February 3, 2005, and until Mr. Dunn decided to terminate my employment, I was a patient at the Alaska Heart Institute at Providence Hospital, Anchorage, and of my primary health care provider, Dr. Kirk Moss. Dr. Moss kept me on a monitor for 30 days, and he confirmed in writing that I should be on medical leave for 12 weeks. (Attachment 6). So the statement that my health problems resulted in 'permanent absence from work' is only true because I was terminated while I was still under the care of physicians, one of whom having requested that I be granted leave under the Family Medical Leave program.

15. A troubling statement in the Government's 'Factual Background' at page 3 is the statement that I was informed on March 21, 2005, that Ms. Martinez had not received any correspondence from me: I did not receive the correspondence bearing the March 21, 2005, date from Wanita Pressley.

16. I did become aware of the e-mail message from Warrant Officer Tillmon to Colonel David Shutt, dated July 14, 2005. I note that Warrant Officer Tillmon advises that 'there are no e-mail messages prior to 8 Feb 05 contained in (Ms. Martinez's) 'in-box' and the 'Sent Items' folder which had no history of outgoing messages from 29 Oct 04 -31 Jan. 05.' A reasonable inference is that Ms. Martinez's e-mails, both incoming and outgoing, had been deleted. I have also learned that Ms. Martinez's last day of employment was February 4, 2005. Unaware

Affidavit of John Mitchell                5

of her departure, I copied her on an e-mail I sent on June 1, 2005.

17. The Notice of Proposed Removal, bearing the date of March 31, 2005, was not mailed until April 7, 2005. It was mailed from the Eagle River Post Office, not from within Fort Richardson.

18. The United States points out, at page 3 of its Brief, that the Notice says that I failed to respond to email, telephonic and certified mail requests for information about my health and plans to return to work. However, it is not pointed out that my supervisors were aware of the position of nurse Carryer and of the existence of my request for FMLA leave. Ms. Carryer wrote to me on February 25, acknowledging receipt of FMLA paper work prepared by former attorney. (Attachment 7). Thus, my supervisors were aware of my medical situation.

19. I had a call from David Moore, my immediate supervisor, on February 5, the day following my release from the intensive critical unit. I sent an e-mail saying that I was not supposed to be stressed, but that contacts could be through my attorney, Mr. Mike McDonough or my fiancee, Robin Boerner. (Attachment 9).

20. The March 31 letter stating that I could request FMLA leave was disingenuous, because my FMLA application was already submitted. It had been received by Nurse Carryer on February 25, 2005 from my lawyer, Mr. McDonough, on my behalf. Also, Dr. Moss faxed a copy to the Command Center. I believe, again, that Mr. Dunn and Mr. Moore disregarded that application because Mr. Dunn outranked Nurse Carryer.

Affidavit of John Mitchell                6

21. As noted above in paragraph 15, I did not receive the March 21 letter advising me to contact the EEO office. The author of that purported letter, it should be noted, is Wanita Pressley, acting Equal Employment Manager, who was the spouse of Malcolm D. Pressley, another civil servant who reported, in a memorandum of February 15, 2005, just five weeks earlier, his finding that my allegations of misconduct in the USARAK Command Center were not justified.

22. My first contact with an EEO person was with Ms. Martinez on January 17, 2005, per the suggestion of General Hirai who wrote to me on January 12, 2005. That initial contact of mine was by e-mail. My e-mail included a complaint. (Attachment 8).

23. On January 18, 2005, Malcolm D. Pressley started an investigation. His wife, Wanita Pressley supervised Ms. Martinez.

24. Soon thereafter, David Moore told me that he had been told to document negatives about me, even if he had to backdate things.

25. I wrote to the EEOC in Seattle on April 14, after my employment was severed. By letter sent to me on April 28, I was told I had 45 days after the personnel action or conduct that I was discriminatory to contact an EEOC counselor. I had already contacted Ms. Martinez, an EEOC counselor. I believed that the return of the letter, date-stamped 'RECEIVED SEDO-EEOC' signified that I had substantially complied in notifying the agency. Since I was by then no longer a government employee, I did not have any

Affidavit of John Mitchell                     7

access to base legal services, and other on-base services. I was so informed by the EEO office when I tried to contact it, after April 9.

26. From my contact with the EEO office, and the information given to me by that office in April before getting the correspondence from the Seattle EEOC office, I believed that EEO counselors were no longer available to me in the EEO office or personnel office where I had been employed.

27. I brought my problems to everyone in the chain of command. I was seeking an apology for the remark that I was 'AWOL'. Among the acknowledgements I received in writing was from the Chairman of the Joint Chiefs of Staff, General Myers.

DATED at Anchorage, Alaska, this 9th day of April, 2006.

                                                              John Mitchell

SUBSCRIBED and sworn to before me, a Notary Public in and for Alaska, this 9th day of April, 2006.



My commission expires: 1/15/2010

Affidavit of John Mitchell        8